# EXHIBIT 1

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

DENARII SYSTEMS, LLC,
a Florida Limited Liability Company,

        Plaintiff,

v.

OMAR ARAB and
GREYNIER FUENTES, individuals,

        Defendants.

_____/

Case No.: 12-42?? ?1

THE ORIGINAL FILED
ON   OCT 30 2012
IN THE OFFICE OF
CIRCUIT COURT

## COMPLAINT

Plaintiff DENARII SYSTEMS, LLC ("Denarii"), by and through its undersigned counsel, sues Defendants OMAR ARAB and GREYNIER FUENTES, and for its Complaint alleges:

### JURISDICTION AND VENUE

1.    Plaintiff Denarii is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business in Miami-Dade County, Florida.

2.    Defendant Omar Arab is a resident of Miami-Dade County, Florida, is over 18 years of age, and is *suri juris*.

3.    Defendant Greynier Fuentes is a resident of Miami-Dade County, Florida, is over 18 years of age, and is *suri juris*.

4.    Venue lies properly with this Court pursuant to Fla. Stat. §47.011. The causes of action accrued in Miami-Dade County, Florida.

5.    The amount in controversy exceeds the sum of $15,000, exclusive of interest, costs, and attorney's fees. In addition, the Plaintiff seeks injunctive relief.

{10302/00285215.1}                1

## GENERAL ALLEGATIONS

6.      Denarii is a distributor and processor of prepaid financial products and services. Denarii's business is primarily focused on the distribution and processing of transactions associated with prepaid cards, which function much like debit cards or electronic gift cards. These prepaid cards are accepted by vendors on the Visa and MasterCard networks.

7.      Denarii handles the real-time electronic processing of transactions made with these cards, which requires a secure platform to protect the financial data of card users and vendors.

8.      In order to develop and maintain card-processing platform, Denarii employs a team of software engineers and developers responsible for writing Denarii's proprietary source code and ensuring that Denarii's platform is both functional and secure.

9.      Denarii's team of software specialists previously included Defendant Omar Arab, who was hired as an employee of Denarii on August 15, 2011, as Denarii's Chief Technology Officer. Arab was responsible for overseeing both Denarii's production side -- which included the development of new source code and software -- as well as its services side, responsible for the processing of card transactions.

10.     Denarii's team also included Defendant Greynier Fuentes, who was hired as an employee of Denarii on June 28, 2010, as Denarii's Director of Software Development.

11.     Given their positions within the company, Defendants Arab and Fuentes were given the highest level of administrative access to Denarii's internal computer network, as well as its servers. These servers stored data that was critical to Denarii's operations, as well as supported the card-processing platform underlying Denarii's very existence.

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

12.     As early as January 2012, Defendants began approaching their colleagues at Denarii with the idea of beginning their own company that would compete with Denarii.  By June 2012, Defendants had solidified their plan, which they proceeded to lay out in detail at a breakfast meeting they held without notifying Denarii management.

13.     In June 2012 at the Marriott Hotel in South Beach, Defendants told at least six other Denarii employees – whom Defendants had invited to the breakfast -- of their plan to secretly develop a new card-processing platform while working for Denarii, before leaving to begin a competitor company.  As Defendants explained, Denarii would pay these employees for their normal software engineering services, and the employees would use their time at Denarii and their expertise to develop a new, more efficient card-processing platform.  When the platform was fully developed and could support Visa and MasterCard transactions, the employees would take the platform's source code and begin their own company.  Defendants were unsuccessful in recruiting other employees to carry out this scheme.

14.     On October 19, 2012, after word of his misconduct reached management, Defendant Fuentes resigned from his position as Director of Software Development at Denarii.

15.     On October 22, 2012, Defendant Arab was terminated by Denarii.

16.     Following Fuentes' resignation, Denarii management demanded that Defendant Fuentes turn over a list of administrative passwords to the Denarii network and servers. This list was critical to Denarii management, as no one else at the company was in possession of a full list of this information.

17.     While Defendant Fuentes supplied a list of passwords to Denarii management, the company soon learned that several of the most important passwords supplied by Fuentes were inaccurate. As further investigation revealed, the password list was also incomplete.

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 ·TEL. (305) 374-5030 · FAX (305) 374-5033

18.     This discovery was made, in part, when Denarii discovered that its secure network had been breached on Sunday, October 21, 2012. During the breach, the intruder accessed the Denarii servers, misconfigured the card-processing platform by altering settings and/or source code, and caused Denarii's system to lose contact with MasterCard. As a result, no MasterCard transactions could be processed by Denarii from Sunday afternoon through mid-day Monday, October 22, 2012.

19.     Subsequent investigation into server logs has revealed that the source of the access was the system's main administrative account – to which only Defendants had access. Log data has also indicated that the infiltrator accessed the Denarii network on the same day, Sunday, October 21, 2012, and was able to remove monitoring software that was put in place by Denarii to track any activity on the network.

20.     On that same day, Denarii came to realize that they had lost access to their main systems administrator account due to the critical password being changed. On information and belief, the only person able to modify this password was Fuentes. Furthermore, Arab was still an employee of Denarii on Sunday, October 21, 2012, which would have given him the ability and opportunity to log into the Denarii network. Based on this access, it is believed that Arab also played a role in accessing the Denarii network. However, as the critical administrative passwords had been changed by Denarii on Friday, October 19, 2012, any access by Arab and Fuentes would not have been possible through the normal channels. Instead, it would have been necessary for these individuals to hack into the network, exceeding any authorization from Denarii (which did not exist).

21.     As a result, Denarii employees and specialized contractors -- including network administrative expert, Kesrick Grey -- worked around the clock on Sunday, October 21 and

Monday, October 22 to return ownership of the main administrative (Global Domain) password to Denarii and to ensure that Denarii's network was once more secure and able to process card transactions.

22.     On Monday, October 22, 2012 – as soon as Denarii had once more gained control of its network – Denarii lost control of its email server, hosted by the cloud-based Microsoft Office 365 service.

23.     While Denarii still does not have access to its company email database, the company has been working with Microsoft to establish its identity as the true owner of this account, and to stop the deletion of any further data and email communications from Denarii's email server.

24.     As Microsoft has verified, control of Denarii email accounts was changed by a "system administrator" on Monday, October 22, 2012.

25.     The registered "system administrator" for the Denarii Microsoft accounts was Fuentes.  On information and belief, Fuentes was responsible for taking over account ownership and blocking Denarii's access to its email accounts.

26.     The contents of the Denarii email accounts assigned to Arab and Fuentes were also erased during the intrusion, thus deleting potentially incriminating data, communications, and other corporate information that is owned by Denarii.

27.     Through the Office 365 service, Defendants were also able to delete data from the cellular telephones of company employees, which were linked to the Microsoft Office 365 service.  As a result, Defendants deleted all data from the phones of Denarii employees Sebastian Cordovez and Ketty Rodriguez on Monday, October 22, 2012.

{10302/00285215.1}                    5

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

28.     Denarii is still without access to its corporate email accounts, which are critical to the company's day-to-day operations and remain within Defendants' control.

29.     Defendants continue to withhold critical passwords for Denarii's network. These passwords include the correct usernames and passwords for the network switches, the SQL server, and the Global Domain (main administrative) password. Without this information, Denarii cannot access or configure significant portions of its network.

30.     Defendants also remain in possession of Denarii's critical documentation and manuals which serve to map and explain the various components of the sophisticated Denarii network, as well as each server's role within the network. This documentation, belonging to Denarii and developed at Denarii's cost, was previously maintained in a DropBox folder controlled by Defendants, which has since been erased from Denarii's network. Such information is critical to any efforts to maintain or troubleshoot the existing network.

31.     All conditions precedent have been satisfied, waived, or are excused as futile.

## COUNT I – VIOLATION OF FLORIDA'S UNIFORM TRADE SECRETS ACT, FLA. STAT. §688

32.     Denarii readopts and incorporates by reference the allegations contained in paragraphs 1 through 31 of this Complaint as if fully stated herein.

33.     Denarii is the developer and owner of proprietary source code utilized in running its card-processing platform.

34.     Denarii's source code constitutes a trade secret, as protected under Fla. Stat. §688.

35.     Denarii derives economic value from the source code based on the fact that this source code is not readily ascertainable by other parties and other card-processing enterprises.

{10302/00285215.1}                    6

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

36.     Denarii has taken reasonable steps to ensure that its source code remains secret, including limiting the number of individuals who have access to Denarii's source code and the servers which house this information.

37.     Defendants had access to Denarii's proprietary source code as a result of their employment with Denarii and their high-level positions in overseeing Denarii's software development.

38.     Denarii's proprietary source code was misappropriated by Defendants, who used improper means to obtain the source code for their own use and profit.

39.     As a direct and proximate result of Defendants' misappropriation of Denarii's trade secrets, Denarii has suffered actual damages in the form of those costs required to respond to Defendants' breach of the Denarii network and source code housed therein.

40.     Denarii faces further damage should these misappropriated trade secrets be used by, sold or distributed to another business enterprise.

41.     Denarii is entitled to both monetary damages and injunctive relief under Florida's Uniform Trade Secrets Act §§688.003-004.

WHEREFORE, Plaintiff Denarii respectfully requests that judgment be entered in its favor and against Defendants Omar Arab and Greynier Fuentes for compensatory damages, prejudgment interest, injunctive relief enjoining the use, sale, and/or distribution of Plaintiff's proprietary trade secrets, costs, and all such other relief as this Court may deem appropriate.

## COUNT II – VIOLATION OF COMPUTER FRAUD
## AND ABUSE ACT, 18 U.S.C. §1030

42.     Denarii readopts and incorporates by reference the allegations contained in paragraphs 1 through 31 of this Complaint as if fully stated herein.

{10302/00285215.1}                                  7

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

43.     Denarii asserts this Count against Defendants, jointly and severally, pursuant to §1030 of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030.

44.     Defendants intentionally accessed the computers of Denarii and Microsoft without authorization and/or exceeded authorized access to the computers of Denarii and Microsoft, and thereby obtained information from the computers of Denarii and Microsoft – both being protected computers.

45.     Defendants intentionally accessed the protected computers of Denarii without authorization and/or exceeded authorized access, and by means of such conduct knowingly caused the transmission of a code or command designed to misconfigure Denarii's servers and disable Plaintiff's ability to process transactions within the MasterCard network.

46.     Defendants did in fact disable the MasterCard network after taking administrative control of the Denarii network on Sunday, October 21, 2012.

47.     As a result of this misconfiguration, Defendants intentionally caused damage to the protected computers of Denarii.

48.     Defendants intentionally accessed the protected computers of Denarii and Microsoft without authorization, and as a result thereof, recklessly caused damage to the protected computers of Denarii and Microsoft.

49.     Denarii has incurred substantial costs greatly exceeding five thousand ($5,000) in value in responding to the offenses committed by Defendants, including investigating the facts and circumstances surrounding the offenses, conducting a damage assessment, attempting to restore data to the condition immediately prior to the commission of the offenses, attempting to restore the Denarii computer network to the condition immediately prior to the commission of the offenses, reconfiguring settings necessary to process MasterCard transactions and resume

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

normal business, and investing in additional security measures to protect the Denarii network from further intrusions.

50.　Plaintiff has been damaged as a direct and proximate result of Defendants' acts.

WHEREFORE, Plaintiff Denarii respectfully requests that judgment be entered in its favor and against Defendants Omar Arab and Greynier Fuentes for compensatory damages, prejudgment interest, costs and all such other relief as this Court may deem appropriate.

## COUNT III – VIOLATION OF STORED COMMUNICATIONS ACT, 18 U.S.C. §§2701 & 2707

51.　Denarii readopts and incorporates by reference the allegations contained in paragraphs 1 through 31 of this Complaint as if fully stated herein.

52.　Microsoft's and Denarii's computer servers are facilities through which an electronic communication service is provided.

53.　Defendants intentionally accessed without authorization Microsoft's and Denarii's computer servers, or Defendants intentionally exceeded an authorization to access Microsoft and Denarii's computer servers, and thereby, obtained access to electronic communications while such was in electronic storage, specifically the electronic mail communications of Denarii employees.

54.　Defendants' conduct in accessing, obtaining, stealing, and deleting Denarii's stored electronic communications without authorization, or in excess of an authorization, was with a knowing and/or intentional state of mind.

55.　Defendants' unlawful access to each of Denarii's stored electronic communications represents a violation of the SCA.

56.　Denarii has suffered actual damages in relation to Defendants' violations of the SCA, including the costs associated with investigating the facts and circumstances surrounding

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

the offenses, conducting a damage assessment, attempting to restore data to the condition immediately prior to the commission of the offenses, and investing in additional security measures to protect the Denarii email accounts from further intrusions.

57.     Denarii has had its corporate communication, intellectual property, proprietary source code, trade secrets, and corporate information unlawfully accessed, trespassed upon, and stolen by Defendants.

58.     Denarii is entitled to monetary damages for each violation of the SCA, of no less than $1,000 per violation, as provided by 18 U.S.C. § 2707(c).

59.     Because the violations of the SCA were willful and intentional, Plaintiff reserves the right to seek punitive damages under 18 U.S.C. § 2707(c), upon a proper record showing.

60.     Denarii is also entitled to the reasonable attorney's fees and costs that it has, and will incur, in order to prosecute this action and vindicate its rights, as provided by 18 U.S.C. §2707(b).

WHEREFORE, Plaintiff Denarii respectfully requests that judgment be entered in its favor and against Defendants Omar Arab and Greynier Fuentes for compensatory damages, prejudgment interest, costs, and all such other relief as this Court may deem appropriate.

## COUNT IV – INJUNCTIVE RELIEF

61.     Denarii readopts and incorporates by reference the allegations contained in paragraphs 1-5, 7-31 of this Complaint as if fully stated herein.

62.     As more fully described herein, Denarii is the developer and owner of source code utilized in running its card-processing platform.  Denarii's business relies upon this source code and its ability to support a functional and secure platform used to process millions of Visa and

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

MasterCard transactions. Without a secure network and secure platform, Denarii's business and reputation as a transaction processor would be severely jeopardized.

63.    Defendants, relying on their previous positions within Denarii and their intimate knowledge of Denarii's network system, have accessed the Denarii network without authorization and without approval. Through strategic interference with Denarii's servers, platform, account settings and email communications, Defendants have crippled Denarii's day-to-day operations, and have refused to submit the information and passwords within their control which are required to ensure full functionality of the Denarii network.

64.    In light of Defendant's improper conduct, Denarii is entitled to a temporary injunction without notice.

65.    Denarii will suffer irreparable harm if its own account and systems information continues to be wrongfully withheld from the company, in turn threatening the market value and overall viability of the company.

66.    Denarii has no adequate remedy at law for Defendants' continued misconduct. The entry of an injunction is necessary to require Defendants to turn over the requested information, prohibit their unauthorized access to the Denarii network, and ensure that Denarii's proprietary source code is not used, distributed, or sold to other business entities.

67.    Given Defendants documented misconduct, there is a significant likelihood that Denarii will prevail on the merits of its claims regarding a violation of the Computer Fraud and Abuse Act, the Stored Communications Act, and Florida's Uniform Trade Secrets Act. Denarii has a clear legal right to the relief requested.

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

68.     The damage to Denarii in the form of lost market share and harm to reputation outweighs any potential harm to Defendants, who would only be obligated to forego their unlawful conduct under the proposed injunction.

69.     Issuance of an injunction is consistent with public policy in protecting trade secrets and promoting legitimate business interests.

70.     Denarii is also entitled to injunctive relief relating to the actual or threatened misappropriation of its proprietary source code under §688.003 of Florida's Uniform Trade Secrets Act.

WHEREFORE, Plaintiff Denarii respectfully requests that this Court enter a temporary injunction:

(1) Enjoining Arab, Fuentes and all persons acting in concert, participation or combination with them:

    a.   from accessing Denarii's internal systems network;

    b.   from accessing Denarii's servers, responsible for running Denarii's processing platform;

    c.   from obtaining, modifying, or deleting any portion of Denarii's proprietary source code;

    d.   from obtaining, modifying, or deleting any stored electronic information and data housed within the Denarii system, including but not limited to, company email communications, documents, certifications for Denarii's products and services, documentation relating to the administrative functions of Denarii, and passwords; and

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

e.  from obtaining, modifying, or deleting any of Denarii's stored documents kept in the DropBox folder removed by Arab and Fuentes.

(2) Prohibiting the use, modification, distribution, or sale of any portion of Denarii's proprietary source code.

(3) Requiring Defendants to immediately supply all passwords used to access Denarii's accounts and servers, including the main administrative passwords for Denarii's information systems, as well as passwords for Denarii's SQL servers, Denarii's network switches, Denarii's Microsoft Office 365 services, and all associated Denarii email accounts.

(4) Requiring Defendants to immediately turn over access to the DropBox folder and all documents previously kept therein which are the property of Denarii.

(5) Granting such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Denarii demands trial by jury on all issues so triable.

Dated: October 30, 2012

Respectfully submitted,

HALL, LAMB AND HALL, P.A.
Attorneys for Plaintiff
2665 South Bayshore Drive, PH1
Miami, Florida 33133
TEL. 305-374-5030
FAX. 305-374-5033
adamhall@hlhlawfirm.com

*Colleen Sneupage*

for  ADAM S. HALL
FBN: 109983

{10302/00285215.1}                13

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

DENARII SYSTEMS, LLC,
a Florida Limited Liability Company,

   Plaintiff,        Case No.: 12-42713 CA 05

v.

OMAR ARAB and
GREYNIER FUENTES, individuals,

   Defendants.

_____/

## ORDER GRANTING PLAINTIFF'S VERIFIED EMERGENCY MOTION FOR PRELIMINARY INJUNCTION WITHOUT NOTICE

  This cause, having come before the Court on Plaintiff's Emergency Motion for Preliminary Injunction Without Notice, and the Court having reviewed the verified motion and the Complaint, it is Ordered and Adjudged as follows,

  The Court makes the following findings of fact for the purposes of granting the instant motion:

1. Plaintiff Denarii is in the business of distributing prepaid cards and processing the associated transactions on the Visa and MasterCard networks. The platform utilized by Denarii to process these transactions relies on source code that was developed and maintained by Denarii.

2. Defendant Omar Arab was employed by Denarii as an at-will employee in the role of Chief Technology Officer from August 15, 2011 until October 22, 2012.

3. Defendant Greynier Fuentes was employed by Denarii as an at-will employee in the role of Director of Software Development from June 28, 2010 until October 19, 2012.

TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

4. Defendants' former positions within Denarii gave them the highest levels of administrative control over Denarii's internal network, as well as those network servers containing Denarii's data, proprietary source code, and platform.

5. Based upon the evidence presented, including the affidavits of Carlos Alonso, Franco Ceruti, Kesrick Grey, Marcela Lazarte, and Maritza Lyngved, the Court finds that Defendants exceeded any authorized access to the Denarii network and associated servers and platforms when they accessed Denarii's system on Sunday, October 21, 2012.

6. The Court finds that Defendants were responsible for the misconfiguring of settings which caused Denarii's platform to lose connectivity with the MasterCard system.

7. The Court finds that Defendants were responsible for withholding and/or changing the account names and passwords relating to Denarii's network switches.

8. The Court finds that Defendants were responsible for interfering with Denarii's ability to access its company email accounts hosted through Microsoft's cloud-based Office 365 service.

9. The Court finds that Defendants were responsible for deleting the company email accounts (also hosted by Microsoft Office 365) previously assigned to Omar Arab and Greynier Fuentes.

10. The Court finds that Defendants removed Denarii's documentation relating to the setup and configuration of its network, previously contained in a DropBox account controlled by Arab.

A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

11. The Court finds that Defendants planned to misappropriate Denarii's proprietary source code for their own financial benefit, through the use, distribution, or sale of Denarii's source code and related software.

12. Denarii has established the elements necessary for entry of a temporary injunction: (1) that it will suffer irreparable harm and has no adequate remedy at law; (2) that it has substantial likelihood of success on the merits; (3) that the threatened injury to the plaintiff outweighs any possible harm to the defendant; and (4) that the granting of the preliminary injunction will not disserve the public interest. *U.S. 1 Office Corp. v. Falls Home Furnishings, Inc.*, 655 So.2d 209 (Fla. 3d DCA 1995).

13. The Court finds that Denarii has established irreparable harm and lack of an adequate remedy at law in light of the likelihood that Defendants will continue their efforts to destroy, alter, or otherwise distribute the stored electronic information and source code belonging to Denarii.

14. The Court finds that Denarii has established a likelihood of success on the merits regarding its claims for Defendants' accessing of Denarii's and Microsoft's protected computers without authorization in violation of the Computer Fraud and Abuse Act, 18 U.S.C. §1030; modification and/or deletion of stored electronic communications and documents in violation of the Stored Communications Act, 18 U.S.C. §§2701 & 2707; and misappropriation of proprietary source code in violation of Florida's Uniform Trade Secrets Act, Fla. Stat. §688, et seq.

15. The Court has determined that the threatened injury to Denarii outweighs any possible harm to the Defendants and that the granting of the preliminary injunction will not disserve the public interest.

A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

16. The Court finds that there is a significant risk that upon receiving notice of this lawsuit and motion for preliminary injunction, Defendants will take additional steps to immediately and wrongfully alter Denarii's stored electronic communications, data, and source code, thereby circumventing the injunction which Denarii seeks to have entered. Such action may in turn threaten the market value and overall viability of the company. Therefore, the Court finds that entry of a preliminary injunction without notice is warranted.

17. In light of the foregoing, the Court grants the following relief:

(1) The Court enters a temporary injunction against Defendants Omar Arab and Greynier Fuentes and enjoins and precludes Arab and Fuentes, and all persons acting in concert, participation or combination with Defendants:

    a.  from accessing Denarii's internal systems network;

    b.  from accessing Denarii's servers, responsible for running Denarii's processing platform;

    c.  from obtaining, modifying, or deleting any portion of Denarii's proprietary source code;

    d.  from obtaining, modifying, or deleting any stored electronic information and data housed within the Denarii and/or Microsoft systems, including but not limited to, company email communications, documents, certifications for Denarii's products and services, documentation relating to the administrative functions of Denarii's network, and passwords; and

    e.  from obtaining, modifying, or deleting any of Denarii's stored documents kept in the DropBox folder removed by Arab and Fuentes.

A TRUE COPY
CERTIFICATION ON LAST PAGE
HARVEY RUVIN, CLERK

(2) The Court prohibits the use, modification, distribution, or sale of any portion of Denarii's proprietary source code and related software.

(3) In addition, Defendants shall immediately provide Denarii with:

    a.  all passwords used to access Denarii's accounts and servers, including, but not limited to, the main administrative passwords for Denarii's information systems, as well as passwords for Denarii's SQL servers, Denarii's network switches, Denarii's Microsoft Office 365 services, and all associated Denarii email accounts;

    b.  access to the DropBox folder and all documents previously kept therein which are the property of Denarii.

(4) Defendants Arab and Fuentes may move to dissolve or modify this Order at any time.

(5) The Court orders Plaintiff Denarii to post a bond in the amount of $ _5,000.00_ within one (1) business day of the entry of this Order and this Order is conditioned upon the posting of said bond.

DONE and ORDERED in Chambers in Miami-Dade County, Florida this _31_ day of October, 2012.

_____
CIRCUIT COURT JUDGE

cc:    Adam S. Hall, Esq.

Marc Schumacher
Circuit Court Judge

STATE OF FLORIDA, COUNTY OF DADE
I HEREBY CERTIFY that the foregoing is a true and correct copy of the original on file in this office. OCT 31 AD 2012
HARVEY RUVIN Clerk, of Circuit and County Courts
Deputy Clerk



IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

DENARII SYSTEMS, LLC,
a Florida Limited Liability Company,

        Plaintiff,

v.

OMAR ARAB and
GREYNIER FUENTES, individuals,

        Defendants.

_____/

Case No.: 12-42... 

THE ORIGINAL FILED
ON OCT 3 0 2012
IN THE OFFICE OF
CIRCUIT COURT MIAMI-DADE CO.
CIVIL DIVISION

## EMERGENCY MOTION FOR PRELIMINARY INJUNCTION WITHOUT NOTICE

    Plaintiff DENARII SYSTEMS, LLC ("Denarii"), by and through its undersigned counsel and pursuant to Fla. R. Civ. P. 1.610(a), hereby moves this Court to enjoin Defendants Omar Arab ("Arab") and Greynier Fuentes ("Fuentes") from accessing Denarii's information network and systems, to prohibit the Defendant's use of any proprietary source code obtained from Denarii, and to require the return of all Denarii passwords and documentation currently within Defendants' control, and as grounds states as follows:[1]

### A. Introduction

    Plaintiff Denarii seeks an emergency injunction against Defendants Arab and Fuentes to enjoin these former employees from unlawfully accessing Denarii's computer network and interfering with Denarii's ongoing business operations. Since leaving Denarii's employ in the past two weeks, Defendants Arab and Fuentes have continued to wreak havoc on Denarii's day-to-day business of processing prepaid card transactions through the Visa and MasterCard

---

[1] Plaintiff's Complaint is incorporated herein by reference.

{10302/00284925.1}        1

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

network.   These once-trusted employees have done so by hacking into Denarii's network, reconfiguring the source code and settings that enable the card-processing platform to operate, and refusing to turn over administrative access to the Denarii system accounts.  Defendants have also utilized their previous knowledge of system passwords and architecture to tamper with the company's email accounts, cellular telephones, and critical documentation previously contained in Denarii's databases.   Unfortunately, such misconduct pales in comparison to Defendants' vocalized plan to misappropriate portions of Denarii's proprietary source code, open their own card-processing business, and use Denarii's own source code to steal Denarii's clients and destroy its business.

Plaintiff Denarii seeks an injunction without notice to ensure that Defendants do not dispose of the data currently within their control, thereby circumventing the injunction which Denarii seeks to have entered.  If notice is provided, Defendants may actively pursue their strategy to purge all information and records wrongfully taken prior to a hearing, causing irreparable harm to Denarii.  In support of this Motion, Plaintiff attaches and incorporates by reference the affidavits of Denarii employees and contractors Carlos Alonso (attached as Exhibit A), Franco Ceruti (attached as Exhibit B), Kesrick Grey (attached as Exhibit C), Marcela Lazarte (attached as Exhibit D), and Martiza Lyngved (attached as Exhibit E).

### B. Factual Background

Plaintiff Denarii is in the business of distributing and processing prepaid financial products and services.  The bulk of Denarii's business relates to the distribution and processing of transactions associated with prepaid cards, which function much like debit cards or electronic gift cards.  These prepaid cards, issued through various banks in several countries, bear either a Visa or MasterCard logo, and can be used by purchasers at any vendor who accepts Visa- or

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

MasterCard-endorsed cards. Denarii oversees the real-time electronic processing of these cards, which requires a secure platform to protect both customers' and vendors' financial data. The platform utilized by Denarii to process these Visa and MasterCard transactions was funded and developed by the company, through the work of software engineers hired either as employees of Denarii, or as independent contractors of Denarii. These engineers wrote and developed a source code that enables the card-processing platform to run, and meets the stringent security requirements demanded by Visa and MasterCard to process instantaneous transactions on their networks. The source code utilized in running and maintaining Denarii's card-processing platform is regularly updated to ensure optimum functionality and security, which requires the ongoing work of software engineers working for Denarii.

On August 15, 2011, Omar Arab began working for Denarii as Chief Technology Officer. In this role, Arab was responsible for overseeing both the production side of Denarii's operations, which included the development of source code and software for use by Denarii, as well as the services side of operations, which included the running of the card-processing platform. Given his position within Denarii, Arab was one of the few authorized individuals with access to various passwords and documentation relating to Denarii's transaction processing systems and platform. However, as early as January 2012, Arab began telling other employees at Denarii of his plans to leave Denarii and begin a new company with several of Denarii's other employees. In June 2012, Arab invited at least six Denarii employees to join him and Defendant Fuentes for a secret breakfast meeting at the South Beach Marriott Hotel, where he proposed to these employees that they begin secretly developing a new version of the platform, at Denarii's expense, and leave Denarii en masse, taking with them the source code developed while

{10302/00284925.1}                     3

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

employees of Denarii.  The other employees did not agree to this plan. Thereafter, Omar Arab was terminated on October 22, 2012.

Defendant Greynier Fuentes began working for Denarii on June 28, 2010, and was employed as Director of Software Development.  Fuentes' job also gave him access to the highest levels of administrative control over Denarii's internal network, as well as those servers containing Denarii's data, proprietary source code, and platform.  Along with Arab, Fuentes began discussing with other Denarii employees the plan to leave Denarii after secretly developing a new platform that could be misappropriated and used in a future business endeavor. When word of this spread, Fuentes resigned from his position effective October 19, 2012. Although Fuentes was asked to supply a list of every password in his possession (so that Denarii could take reasonable steps to change the passwords and protect its system), the list he gave to Denarii was incorrect and incomplete.  Fuentes has yet to turn over access to the main administrator role for Denarii's network, in turn creating enormous problems for Denarii in the running of their day-to-day operations.

Within the past week and a half, Defendants have continued to access the Denarii internal network and servers without authorization or approval, and have done so at great peril to the company.  Defendants wrongfully took control of Denarii's company email server provided through the cloud-based Microsoft Office 365 service, have blocked various employees' access to their email accounts, and deleted entire accounts from the system, including both Arab's and Fuentes' accounts.  Defendants have also used their former high-level access to hack into the Denarii system and misconfigure Denarii's platform, thus shutting down the ability of Denarii to process any MasterCard transactions.  This action has not only crippled Denarii, but has also created problems in terms of its relationship with MasterCard.  Defendants have misconfigured

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

other portions of the Denarii network as well, including the account names and passwords associated with the network switches utilized in running Denarii's systems.   In addition, Defendants have deleted key documentation from the Denarii system altogether, including a folder full of critical data that Omar Arab was keeping in a personal DropBox folder.

As the memorandum of law below will demonstrate, Denarii is entitled to the entry of a preliminary injunction without notice in order to prevent Defendants Arab and Fuentes from continuing their campaign to cripple Denarii and misappropriate its proprietary source code information.

### C. Memorandum of Law

### 1.  Plaintiff is Entitled to Entry of a Preliminary Injunction Without Notice

In order for an injunction to be granted under Fla. R. Civ. P. 1.610, the plaintiff must prove: 1) that he will suffer irreparable harm and he has no adequate remedy at law; (2) the substantial likelihood of success on the merits, (3) that the threatened injury to the petitioner outweigh any possible harm to the respondent, and (4) that the granting of the preliminary injunction will not disserve the public interest. *Singletary v. Costello*, 665 So. 2d 1099 (Fla. 4th DCA 1996); *U.S. 1 Office Corp. v. Falls Home Furnishings, Inc.*, 655 So. 2d 209 (Fla. 3d DCA 1995); *Graham v. Edwards*, 472 So.2d 803, 806 (Fla. 3d DCA 1985) In this case, Plaintiff satisfies these requirements.

Further, Fla. R. Civ. P. Rule 1.610(a)(1) provides for the issuance of a temporary injunction without notice to the opposing party.[2]  "To justify issuance of a restraining order

---

[2] The Rule provides that such an injunction may issue if "it appears from the specific facts shown by affidavit or verified pleading that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, and the movant's attorney certifies in writing any efforts that have been made to give notice and the reasons why notice should not be required." *Id.*

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

without notice, it must appear that the time required to give notice of a hearing would actually permit the threatened injury to occur." *Lieberman v. Marshall*, 236 So.2d 120, 125 (Fla. 1970).

In the instant case, there is a significant risk that upon receiving notice of this lawsuit and motion for preliminary injunction, Defendants will take additional steps to immediately and wrongfully alter the proprietary source code information and stored electronic data. Without an injunction, Defendants may be able to access Denarii's confidential and proprietary source code information, through which Defendants threaten the market value and overall viability of the company. Defendants would thereby be committing the very wrong which this lawsuit and injunction seek to prevent. In fact, notice of this motion would actually precipitate the threatened injury by encouraging Defendants to conceal or destroy the information currently within their control. As such, Defendants must be enjoined immediately from any further access to Denarii's stored electronic data and data systems.

## 2. The Entry of an Injunction is Required to Prevent Irreparable Harm and Plaintiff Has No Adequate Remedy at Law

Denarii will suffer irreparable injury if Defendants are not immediately enjoined from accessing Denarii's data systems and proprietary credit card processing platform. As set forth above, Defendants have already taken steps to destroy, alter and damage the stored electronic information and source code belonging to Denarii, and this injury is by its very nature irreparable, since no amount of money damages can replace the critical electronic information that Fuentes seeks to alter and/or delete. *See, e.g., Wit Walchi Innovation Technologies, GMBH v. Westrick*, 2012 WL 33164, at *2 (S.D. Fla. Jan. 6, 2012) (granting an ex parte temporary restraining order where loss or damage to confidential and proprietary source code information would constitute "immediate irreparable injury" to plaintiff). Therefore, Denarii is threatened

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

with irreparable injury if Defendants are not immediately enjoined from accessing and modifying Denarii's stored electronic data and proprietary source code information.

Furthermore, Denarii has no adequate remedy at law available if Defendants are permitted to continue accessing, modifying and/or deleting company records and source code information. As noted above, once the stored electronic information is wrongfully deleted or modified by Defendants, it may indeed be unrecoverable. In addition to this irreversible damage, Defendants' unlawful conduct has caused, and may continue to cause, serious injury to Denarii's reputation and goodwill. This is especially true if further service outages on the platform are caused by Fuentes' illegal interference with the Denarii credit card processing platform. In a business where financial information is being stored and processed, such injury may be indeed be fatal to the company as a whole. Denarii has no adequate remedy at law to redress such misconduct. *See, e.g. Time Warner Cable of New York City v. Freedom Electronics*, 897 F.Supp. 1454, 1458 (S.D.Fla. 1995) (no adequate remedy at law where defendant's unlawful conduct in decoding and selling proprietary information and equipment injured plaintiff's "reputation and good will, its ability to attract and finance the future acquisition of quality services, and further impairs its ability to enhance its future growth and profitability.").

Besides the intangible harms for which there is no adequate remedy at law, Denarii would also suffer immeasurable money damages that would be nearly impossible to accurately determine. While the number of documents stolen or deleted by Defendants may be quantified, the effect of Defendants' unlawful acts in interfering with Denarii's processing platform and ability to provide uninterrupted, secure services to its clients cannot. The dilution of Denarii's market position due to damage and interruptions to the platform caused by Defendants is yet

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 •TEL. (305) 374-5030 • FAX (305) 374-5033

unknown, and the negative effect Defendants' actions may have on Denarii is not only indeterminate, but potentially catastrophic.

### 3. There is a Substantial Likelihood That Plaintiff Will Prevail on the Merits

Without authorization, and contrary to Denarii's express demands for system passwords, Defendants have continued to access the Denarii credit card processing platform, source codes, and other system accounts. Denarii, as the sole owner of the proprietary information being accessed, obtained, and interfered with by Defendants, is entitled to protection under the Computer Fraud and Abuse Act, the Electronic Communications Privacy Act (including the Stored Communications Act), and the Florida Uniform Trade Secrets Act.

#### *Computer Fraud and Abuse Act*

The Computer Fraud and Abuse Act ("CFAA"), codified at 18 U.S.C. § 1030, is a federal criminal statute which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] … information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). The CFAA also provides for a "civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). The relevant portion of the statute imposes liability on whoever:

> (5)(A) knowingly causes the transmission of a program, information, code or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; … or

18 U.S.C. § 1030(a)(5)(A). In the present case, Defendants knowingly accessed Denarii's protected computer by logging into the Denarii server and taking ownership of the system's administrative account. At that point, Defendants damaged the protected computer system by uninstalling programs, deleting stored e-mail accounts and correspondence, and stealing portions of Denarii's proprietary source code information. Such access exceeds the scope of any authorization, and is therefore actionable under the CFAA. *See, e.g. TracFone Wireless, Inc. v.*

*Cabrera*, 2012 WL 3264514, at *7 (S.D. Fla. July 11, 2012) (granting permanent injunction after finding defendant employee in violation of CFAA where employee exceeded authorized access to proprietary computer system in order to alter information in the system).

Moreover, the actions undertaken by Defendants in obtaining and altering Denarii's credit card processing platform and computer system have caused the requisite "loss" and "damage" in excess of $5,000 as defined under the CFAA. The CFAA defines "loss" to include "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, systems or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of the interruption of service." 18 U.S.C. § 1030(e)(11). Similarly, "damage" is defined to mean "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). Defendant's actions have not only impaired the overall integrity of the Denarii processing platform – as evidenced by the crash of Denarii's secure MasterCard platform, caused by Defendants – but they have also caused losses to Denarii in the form of significant costs associated with responding to the Defendants' infiltration of the system, and those attempts made to restore the MasterCard platform and the broader Denarii network to its condition prior to the offense. *See, e.g., TracPhone Wireless*, 2012 WL 3264514, at *7-8 (finding actionable loss and damage where plaintiff was forced to spend "well in excess of $20,000 investigating and assessing the possible impairment to the integrity of its proprietary computer and wireless networks and conducting a damage assessment" subsequent to defendant's unauthorized access and alterations to plaintiff's computer system) (citing *Shurguard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F.Supp.2d 1121, 1127 (W.D. Wash. 2000) (finding an impairment of integrity to exist when a defendant has "infiltrated

{10302/00284925.1}                    9

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

the plaintiff's computer network ... and collected and disseminated confidential information [even if] no data was physically changed or erased"). In the instant case, as demonstrated by the affidavit of network administration expert Kesrick Grey and the irrefutable system logs showing Defendants' unauthorized access to the Denarii system, Defendants are in clear violation of the CFAA.

*Stored Communications Act*

Similarly, Plaintiff exhibits a strong likelihood of prevailing on its claims under the Stored Communications Act ("SCA"), a federal criminal statute codified in relevant part at 18 U.S.C. § 2701, with a civil cause of action being provided under the Act in § 2707. The relevant portion of the SCA imposes criminal and/or civil liability on whoever:

> (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or
>
> (2) intentionally exceeds an authorization to that facility;
>
> and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage ...

18 U.S.C. § 2701(a). Under the statute, "electronic communication service" is defined as "any service which provides users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). "Thus, the SCA clearly applies, for example, to information stored with a phone company, Internet Service Provider (ISP), or electronic bulletin board system (BBS)." *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003).

In the present case, Defendants have refused to turn over the administrative password to Denarii's company e-mail accounts. These e-mails are stored through the cloud-based Microsoft Office 365, an electronic communication service licensed to Denarii. In the meantime, Defendants have blocked Denarii employees' access to their company e-mail accounts, have

changed various passwords within the system, and have deleted multiple e-mail accounts from the system entirely. Moreover, this willful destruction of Denarii's stored electronic communications is evidence of an attempt by Defendants to conceal any records relating to Defendants' widespread misconduct. By interfering with Microsoft's cloud-based Office 365, retrieving Denarii's stored electronic communications (housed by Microsoft within the cloud-based system), altering these stored communications through calculated deletions, and blocking Denarii's access to the communications, Defendants are liable under the SCA. Because Plaintiff exhibits every likelihood of prevailing under the SCA, the preliminary injunction restraining Defendants' misconduct should be granted.

### *Florida's Uniform Trade Secrets Act*

Additionally, Plaintiff has valid claims under the Uniform Trade Secrets Act, codified in Section 688 of the Florida Statutes. Florida's Uniform Trade Secrets Act ("FUTSA") requires the plaintiff to establish that:

(1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy, and

(2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it.

*Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F.Supp.2d 1271, 1291 (S.D. Fla. 2001) (citing Fla. Stat. § 688). To qualify as a trade secret under the statute, the "information that the plaintiff seeks to protect must derive economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy." *Id.* (citing *American Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (applying Florida law)). Relief under the statute includes provisions for both monetary damages and injunctive relief. Fla. Stat. §§ 688.003-688.004; *see Hatfield v. AutoNation, Inc.*,

939 So. 2d 155, 157 (Fla. 4th DCA 2006) ("The statute provides injunctive relief when trade secrets have actually been misappropriated, as here, or misappropriation has been threatened. An injunction with respect to stolen business secrets is authorized where it will eliminate commercial advantage derived from the misappropriation and affirmative acts to protect a trade secret can be compelled by court order.").

Plaintiff's source code – which is utilized in running its card processing platform and has cost Denarii development sums well into the millions – constitutes a trade secret under the FUTSA. *See, e.g., Pegasus Imaging Corp. v. Northrop Grumman Corp.*, 2010 WL 4627721, at *5 (M.D. Fla. Nov. 5, 2010) (source code qualifies as trade secret under the FUTSA). Denarii took reasonable steps to protect the secrecy of its source code – the company's lifeblood – by ensuring that a limited number of trusted individuals had access to this information, including the Defendants. This trade secret was misappropriated by Defendants when they hacked into the Denarii network on Sunday, October 21, 2012 and subsequently obtained and modified Denarii's proprietary source code. Denarii learned of this misappropriation when MasterCard alerted Denarii to the fact that its server was "offline" and that Denarii was unable to process any MasterCard transactions. As subsequent investigation revealed, this interruption was caused by Defendants' documented and unlawful intrusion into the Denarii system and modification of Denarii source code. Furthermore, as Franco Ceruti's affidavit makes clear, the Defendants have long voiced their intention to steal Denarii source code and use it in their own business endeavor after their departure from Denarii.

Therefore, Denarii has demonstrated a substantial likelihood that it will prevail on the merits in each of these actions.

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

### 4. The Injury to Denarii Outweighs Any Potential Harm to Arab and Fuentes

The injury to the plaintiff in this case greatly outweighs any potential harm to the defendant. In this case, Defendants Arab and Fuentes will suffer no harm recognized by the law if enjoined from accessing, modifying, distributing, and/or selling Denarii's proprietary source code. Nor will the Defendants suffer harm from being required to return the passwords and electronic data that rightfully belong to Denarii. On the other hand, Denarii stands to suffer grievous injury and potentially great damage should Defendants be permitted to distribute or sell this protected source code. As discussed more fully above, Denarii faces the threat of dilution of its market position, interruptions in its processing platform, and loss of goodwill to an unquantifiable magnitude. Clearly, in balancing the equities, the potential injury to the plaintiff far outweighs any potential harm to the defendant. See, e.g., *Flexiteek Americas, Inc. v. PlasTEAK, Inc.*, 2009 WL 2957310 (S.D. Fla. 2009) ("The balance of hardships favors Plaintiffs because the burden placed on Defendants by an injunction would consist only of the cost of forgoing infringing conduct. While Plaintiffs face loss of market share and harm to reputation. Further, Plaintiffs spent considerable time and effort to obtain the '881 Patent and the legal rights attached to the patent should be readily enforceable.")

### 5. Public Policy Will Not Be Disserved by Entry of the Injunction

Public policy will not be disserved by issuance of an injunction in this case. Florida's public policy in the context of protecting trade secrets clearly favors the protection of legitimate business interests. *See Hatfield v. AutoNation, Inc.*, 939 So.2d 155, 157 (Fla. 4th DCA 2006) (granting injunction against company's former employee based on misappropriation of trade secrets, and noting "Florida's public policy interest in protecting trade secrets"). In this case, Plaintiff seeks only to protect its legitimate business interests and trade secrets from wrongful

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 •TEL. (305) 374-5030 •FAX (305) 374-5033

misuse. Therefore, issuance of an injunction to prevent Defendants from continuing their unlawful access to Denarii's computer systems and their misappropriation of Plaintiff's proprietary source code and data is consonant with public policy concerns.

### 6. Requirement for Plaintiff to Post a Bond

Pursuant to Florida law, the Court is required to have the Plaintiff post a bond in an amount the Court deems proper upon granting the requested injunction. Fla. R. Civ. 1.610(b). The purpose of the injunction bond is to provide sufficient funds to cover the adverse party's costs and damages in the event the injunction is later determined to have been improvidently entered. *Braswell v. Braswell*, 881 So.2d 1193 (Fla. 3d DCA 2004).

In considering the bond in the instant case, Plaintiff respectfully suggests that the court consider that the Plaintiff only seeks to enjoin the Defendants from accessing and interfering with Denarii's ongoing business operations and utilizing any proprietary source code developed by Denarii, which Defendants are required to do under the law. As such, the Plaintiff respectfully suggests that the Court set the bond for this injunction in the amount of $500.

### D. Relief Requested

Based upon the foregoing, Plaintiff Denarii respectfully requests that this court enter a preliminary injunction:

(1) Enjoining Arab, Fuentes and all persons acting in concert, participation or combination with them:

    a. from accessing Denarii's internal systems network;

    b. from accessing Denarii's servers, responsible for running Denarii's processing platform;

{10302/00284925.1}  14

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 • TEL. (305) 374-5030 • FAX (305) 374-5033

    c. from obtaining, modifying, or deleting any portion of Denarii's proprietary source code;

    d. from obtaining, modifying, or deleting any stored electronic information and data housed within the Denarii and/or Microsoft systems, including but not limited to, company email communications, documents, certifications for Denarii's products and services, documentation relating to the administrative functions of Denarii's network, and passwords; and

    e. from obtaining, modifying, or deleting any of Denarii's stored documents kept in the DropBox folder removed by Arab and Fuentes.

(2) Prohibiting the use, modification, distribution, or sale of any portion of Denarii's proprietary source code and related software.

(3) Requiring Defendants to immediately provide Denarii with:

    a. all passwords used to access Denarii's accounts and servers, including, but not limited to, the main administrative passwords for Denarii's information systems, as well as passwords for Denarii's SQL servers, Denarii's network switches, Denarii's Microsoft Office 365 services, and all associated Denarii email accounts;

    b. access to the DropBox folder and all documents previously kept therein which are the property of Denarii.

(4) Granting such other relief as this Court deems just and proper.

Respectfully submitted,

HALL, LAMB AND HALL, P.A.

HALL, LAMB AND HALL, P.A., PENTHOUSE ONE, 2665 S. BAYSHORE DRIVE, MIAMI, FLORIDA 33133 · TEL. (305) 374-5030 · FAX (305) 374-5033

Attorneys for Plaintiff
2665 South Bayshore Drive, PH1
Miami, Florida 33133
TEL. 305-374-5030
FAX.  305-374-5033
adamhall@hlhlawfirm.com

_for_ ADAM S. HALL
FBN: 109983

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Case No.:

DENARII SYSTEMS, LLC,
a Florida limited liability company

     Plaintiff,

vs.

OMAR ARAB and
GREYNIER FUENTES, individuals,

     Defendants.

_____/

## AFFIDAVIT OF CARLOS ALONSO

**BEFORE ME,** this day personally appeared Carlos Alonso, who first being duly sworn on oath, deposes and says:

1. I am over 18 years of age and make this affidavit based upon my personal knowledge.

2. I have been an employed as network manager of Denarii Systems, LLC since February 2010.

3. I have previously worked with Omar Arab ("Arab") and Greynier Fuentes ("Fuentes"), before they left Denarii's employ.

4. Within the past month, Arab has made several comments implying that Denarii was in bad shape and that other Denarii employees, including myself, should start looking for another job.

5. In mid-2012, both Arab and Fuentes stated to me that they had plans to take control of the Denarii processing platform, so that once they had left the company, Denarii

{10302/00285053.1}       1

**EXHIBIT**

_A_

would have to depend on Arab and Fuentes to run the Denarii platform. At that point, Arab and Fuentes told me that they intended to bill Denarii for their services in running the Denarii platform. This plan was discussed several times with me and with other Denarii employees. This plan was also discussed at a breakfast meeting held in June 2012 at the Marriott Hotel in Miami Beach, attended by Arab, Fuentes, Maybel Martin, Javier Machin, Humberto Moreno, Franco Ceruti, Frank Alvarez and myself.

6. As time passed, Arab continued to reference these plans. Approximately two weeks ago, Arab requested a conference call with Fuentes, Frank Alvarez and me, where Arab made comments about a trap from "el Viejo" (referring to Jonathan Mytnik, Denarii's president) to see if Frank and I were being loyal to Arab and his "team."

7. The incident Arab was referring to as a "trap" involved a request from Mr. Mytnik that I look into a potential problem with one of our clients. When I was asked to look into the problem, I alerted my supervisors that an error had occurred within the system and was being addressed. When Arab found out that I had explained the problem to our supervisors, he saw this as a sign of disloyalty, and grew angry that I had not concealed the problem from others at the company.

8. In another incident that occurred approximately three weeks ago, while Arab was still employed by Denarii, Arab offered me $10,000 if I would participate in his scheme to sell Denarii an e-commerce application from an outside source. Arab's plan was to obtain the application's source code from outside programmers and represent that it had been developed by Denarii's own programmers for the company.

9. In my role as network manager, I previously had access to the administrative passwords for Denarii's information systems. The only other person who had access to these passwords was Greynier Fuentes.

10. Upon Fuentes' resignation, he surrendered a list of passwords to Denarii. However, this list does not include all of the passwords needed to run Denarii's system. Most importantly, Denarii is missing a password that allows access to the administrative rights for all of Denarii's databases.

11. Since Arab and Fuentes left Denarii, the main administrative password for the entire system has been changed at least once. This occurred on Sunday, October 21, 2012, at which point in time I no longer had access to the main administrative password. On that date, the only person who had access to the main administrative password was Fuentes. Therefore, the password was not changed by me, and could only have been changed by Fuentes.

12. As a result of this password being changed, Denarii lost access to its servers and all of its stored electronic data and information.

13. Thereafter, Denarii has spent days trying to recover access to all of the various databases contained within Denarii's servers, and to try to take control of the situation to make sure the platform and other information remains secure.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Carlos Alonso

SWORN TO AND SUBSCRIBED before me this 24ᵗʰ day of October, 2012, by _Carlos David Alonso_ who is personally known to me or has produced _FL Driver's License_ as identification and did take an oath.

_____

NOTARY PUBLIC, State of Florida
Print name:

My Commission Expires:

RUTH MARQUEZ
MY COMMISSION # EE 131886
EXPIRES: September 19, 2015
Bonded Thru Notary Public Underwriters

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Case No.:

DENARII SYSTEMS, LLC,
a Florida limited liability company

     Plaintiff,

vs.                                                                         12-42713CA05

OMAR ARAB and
GREYNIER FUENTES, individuals,

     Defendants.

_____/

## AFFIDAVIT OF FRANCO CERUTI

**BEFORE ME,** this day personally appeared Franco Ceruti, who first being duly sworn on oath, deposes and says:

1. I am over 18 years of age and make this affidavit based upon my personal knowledge.

2. I have worked for Denarii Systems, LLC, as an independent contractor since September 2011. I am Denarii's sole software architect.

3. While at Denarii, I have worked with both Omar Arab ("Arab") and Greynier Fuentes ("Fuentes").

4. During my time at Denarii, I have learned of several instances in which Arab and Fuentes have accepted kickbacks on certain contracts, and have submitted false invoices on projects completed for Denarii.

5. Omar Arab has been charging me 20 percent of my salary in return for Denarii contracts. Based on my receipt of a $10,000 monthly payment from Denarii for my

EXHIBIT
B

services, this amounts to $2,000 a month paid to Arab. I felt I had no choice but to pay Arab this money, as he was the person making hiring decisions for my position, and because he made it clear that I would not receive any Denarii contracts unless I gave a portion of my payments to Arab.

6. I am also the principal for an entity named XTrend, which contracts with Denarii for programming services at the rate of $45 per hour. When Arab made the decision to hire XTrend for these purposes, he made it clear that no Denarii contracts would be awarded to XTrend unless I also agreed to pay him 30 percent of the payment that Denarii made to XTrend. Because XTrend bills Denarii for 160 hours per month, this amounts to $2,160 paid to Arab for every month of work that XTrend has done.

7. Combining the payments I made to Arab for my own contracts with the payments that XTrend made to Arab, I would regularly pay $4,160 per month directly to Arab, so that he would continue to award Denarii contracts to my companies.

8. Immediately after I started working for Denarii, Arab asked me to include in my invoice to Denarii charges for Alberto Padin, an Argentinean software analyst. After my first month of work, I included these charges on my invoice to Denarii, believing them to be for some legitimate work that Padin had completed. After that, Arab demanded that I pay Arab the money for Padin's alleged work. At that point, I realized that Padin was doing no work on any Denarii projects, neither in Argentina, nor in Miami.

9. During September 2011 and October 2011, Arab made me include Alberto Padin on my invoices to Denarii, despite the fact that Padin had done no work for Denarii. I know that Padin and Arab are familiar with each other, because I met both of them

while they were working together as business partners in 2007.  That is how I came to know both Arab and Padin.

10. After I submitted the September and October 2011 invoices, I approached Arab to discuss the situation, and I explained to him that I was not willing to include charges for Padin if he was not legitimately completing any work for Denarii.  I made it clear that I was not comfortable with the situation, and would not cooperate with his request to bill Denarii (through my company) for hours supposedly worked by Padin. The topic came up multiple times over the next several months, but ultimately the discussion of Alberto Padin ended in February of 2012.  At that point, Arab instructed me that Padin was no longer going to be billed, and he instead mentioned the name of a new provider, "Optimus."  I only later learned that "Optimus" was simply a substitute for Alberto Padin, and that Optimus was also not performing any work for Denarii.

11. When I asked about Optimus, Arab made it clear that Optimus had been invented in order to charge for Padin's alleged work after I had refused to include Padin on my invoices.  However, I learned at the beginning of 2012 that Optimus was also not performing any work for Denarii.  While I never billed for Optimus, I learned that Arab was submitting false invoices to Denarii for work that Arab claimed had been completed by Optimus.  None of this work was ever completed.

12. In December of 2011, I asked Arab to hire a Database Administrator in order to optimize the databases Denarii had in production and enhance the development of new databases.   In response, Arab never acknowledged my request to hire a

supporting Database Administrator, and instead dismissed all organizational diagrams I had drafted to include a Database Administrator.

13. Despite the fact that a Database Administrator was never hired by Denarii, in September of 2012, I learned that Denarii was being charged for the services of a Database Administrator under the name "Optimus." I learned this after hearing a comment made by Greynier Fuentes made to Arab, which acknowledged that "Optimus" had been charging as a Database Administrator since March 2012.

14. During my time at Denarii, I never worked with anyone who was a Database Administrator from Optimus. If there had been a Database Administrator hired to work on Denarii projects, that person would need to report and work with me, since I am Denarii's systems architect.

15. I have noticed that Arab also refuses to cancel certain contracts in place for Denarii, despite the fact that these resources do not provide the results they should. There is one contract in particular with a Mexican software development company, CDA, which has been particularly unproductive. Even though I repeatedly asked Arab to cancel these CDA operations since March 2012, he refused to do so. I suspect that he is also charging some value for each hour of CDA work that is paid for by Denarii, which would explain why he does not want to cancel the contract.

16. In another instance, which occurred in January 2012, Arab proposed that I join "Blit," a company that Arab and Fuentes would create to do business in Miami. My initial understanding was that this would be a software company, specializing in sales and distribution. After being asked to participate, I told Arab that I was interested in the opportunity. In response, Arab explained to me that in order to avoid problems with

Denarii, the new company "Blit" would be in the name of Fuentes' girlfriend (now fiancée) and the girlfriend's father.

17. I heard nothing more about Blit until Humberto Moreno -- a contract developer who had been working for Denarii -- left in July of 2012. At that point, I heard a comment that Denarii was going to pay Humberto Moreno for his work, but that it would be paying Moreno through Blit. At that point, I came to understand that Arab and Fuentes had in fact created Blit, and were positioning it as a provider to Denarii. Through Blit they would be able to sell products and services to Denarii at a high markup, and would use their positions within Denarii to make sure that the contracts were awarded to Blit.

18. At the end of June 2012, I was invited to a breakfast meeting at the Marriott hotel in South Beach, which I assumed was a normal working breakfast. Arab and Fuentes had called the meeting. Maybel Martin, Javier Machin, Carlos Alonso, Humberto Moreno, Frank Alvarez and I were in attendance. At that meeting, Arab proposed a plan to "end" Denarii's platform, take Denarii's code, and make Denarii pay us every month for processing transactions.

19. At that meeting, the strategy of Arab, Fuentes, and the others  involved behind the scenes was made clear: We would simultaneously entertain Denarii with platforms that did not work well (such as the 1.4, 1.5, 1.6 and 1.7 version platforms) while we secretly worked on the more effective 2.0 version, developed at Denarii's expense. When the 2.0 version platform was ready, we would leave Denarii and then offer to sell Denarii the 2.0 version from the outside. Or we would run the 2.0 platform ourselves through a new entity.

20. In our employee meetings, Arab would repeatedly refer to the fact that all of the Denarii management team were "idiots" and that only he had the "360-degree vision" that would lead to the success of the business.  As a result, Arab indicated that we should all give up at Denarii and follow him elsewhere.

21. In one of these employee meetings – within the past month or two – Fuentes told me that he was not willing to give control of the platform to anyone else, that he would not turn over the passwords to anyone else, and that once he was gone, everything would be "destroyed."

22. Two weeks ago, Arab asked everyone to decide if we were willing to resign and go with him.  Arab indicated that he would get an office in South Beach for us to work out of.  It is my understanding that Arab now intends to implement his plan regarding the Denarii platform.


**FURTHER AFFIANT SAYETH NAUGHT.**



_____
Franco Ceruti

SWORN TO AND SUBSCRIBED before me this 26th day of October, 2012, by

_____ who is (personally known) to me or has produced

_____ as identification and did take an oath.



_____
NOTARY PUBLIC, State of Florida

DAYANA LOPEZ
MY COMMISSION # EE011755
EXPIRES: JUL 26, 2014
Bonded through 1st State Insurance

Print name:

My Commission Expires:

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Case No.:

DENARII SYSTEMS, LLC,
a Florida limited liability company

     Plaintiff,

vs.

OMAR ARAB and
GREYNIER FUENTES, individuals,

     Defendants.

_____/

## AFFIDAVIT OF KESRICK GREY

**BEFORE ME,** this day personally appeared Kesrick Grey, who first being duly sworn on oath, deposes and says:

1. I am over 18 years of age and make this affidavit based upon my personal knowledge.

2. I am an independent network engineer and administrator, specializing in the administration of Microsoft servers.

3. I own a company called Computer Expert Groups based in Broward County, Florida, which specializes in building, maintaining, and fixing sophisticated network systems.

4. Much of my expertise is in the area of recovering, restoring, and assessing instances of data loss. I am also hired by many companies to assess their computer networks in order to patch and protect any "holes" in their systems.

5. My formal training has been through Microsoft. I currently hold multiple certifications from Microsoft, including my Microsoft Certified Systems

EXHIBIT

C

Administrator certification (based on the Windows Server 2003 operating system), and my Microsoft Certified Information Technology Professional certification (based on the Windows Server 2008 operating system).  Obtaining these credentials requires extensive knowledge of the intricacies of network administration, including a high-level understanding of both network infrastructure and network security.

6. I was contacted by Denarii Systems during the week of October 15, 2012, to ensure that any transition to new network administration personnel would run smoothly, and that the servers they employed in running their main platform would not be jeopardized.  A significant priority was ensuring the security of the network and servers, which are responsible for handling the millions of Visa and MasterCard transactions that Denarii processes.

7. After meeting with Denarii executives, one of my first steps was to visit the Terremark facility known as NAP of the Americas.  NAP (Network Access Point) of the Americas is a facility located in Miami which houses the servers of Denarii, as well as the servers of numerous international companies (e.g., Sprint) transacting business in North America, South America, and other points around the globe.  Very few individuals have access to NAP, as the equipment housed there is not only sophisticated, but demands the highest levels of security.

8. Ensuring the security of Denarii's NAP servers was one of my first priorities for several reasons.  First, it was critical that the servers be physically protected, and that Denarii ensure that any former employees would no longer have access to the facility.  Second, it was my job to take an inventory of what was at NAP and become familiar

with the servers both for the transition to new personnel, as well as to prepare for any possible intrusion with the servers or platform.

9. I was alerted on Friday, October 19, 2012, that one of the employees who Denarii was interested in terminating had resigned.  At that point, it was imperative that Denarii maintain control of its systems and change any passwords that had once been in the employee's control.

10. Based on the list of passwords turned over by the employee, I set about changing these passwords in order to ensure that Denarii maintained control over its network.

11. These passwords were changed by me on Friday, October 19, 2012, as well as on Saturday, October 20, 2012.

12. The most critical of these passwords was the Global Domain password, which controls Denarii's entire network and which I personally changed upon Greynier Fuentes' departure from Denarii.

13. On Saturday, October 20, 2012, Denarii appeared to be in complete control of its network. As a precaution, I also installed monitoring software in order to keep track of any unusual activity on the servers and to ensure I had a record of any activity being conducted on the server, along with information relating to who was accessing the server.  I was able to monitor the network through installation of the program "LogMeIn," which allowed for remote access to the server for easier monitoring.

14. At 1:29 a.m. on Sunday, October 20th, the server logs demonstrate that Denarii's network was infiltrated by someone else with access to the main administrative account.  I have since verified that this was not done by anyone with Denarii's authorization or approval.

15. Based on the server logs, as well as the intruder's ability to hack into the Denarii network – which would have required familiarity with the system, as well as a "backdoor" means of entry – I have concluded that this was most likely the activity of Greynier Fuentes or Omar Arab, as these were the only two individuals with access to the unaccounted-for Global Domain password.

16. The server logs also show that at 1:29 a.m., the program I had previously installed – LogMeIn – was uninstalled by the intruder.  This uninstallation would make it more difficult to track an intruder's comings and goings, as well as monitor what the intruder was doing during his time in the network.

17. The next accounted-for activity on the server occurred at 6:27 a.m., when the intruder took full ownership of the administrative account for the network, essentially shutting Denarii out of its system altogether.  The same server log shows the intruder installing his own LogMeIn account on the network, which would allow him to remotely access and monitor anything being done to the network.

18. After numerous hours spent getting back into the system and patching any holes that would allow further intrusion, I was once more able to return control of the administrative account running the network to Denarii late Sunday night.

19. During the unauthorized infiltration of the Denarii system, numerous switches on the servers were misconfigured and assigned new account usernames and passwords.

20. This misconfiguration caused the Denarii platform to go offline, thus prohibiting any MasterCard transactions from being processed at any point from Sunday afternoon through Monday evening.

21. The network switches, which were assigned new account usernames and passwords by the intruder(s), still remain outside Denarii's control. The usernames and passwords submitted by Greynier Fuentes on October 19th no longer work, which presents a tremendous problem for any administrator trying to troubleshoot problems with the network. As a result, Denarii has essentially been shut out of their own switches and routers, which still remain administratively locked.

22. Since returning ownership of the Denarii network to Denarii Sunday night, I have continued my work for Denarii, seeking to address the other problems created by the infiltration.

23. One of my main tasks has been to take back ownership of Denarii's email accounts, which are serviced through Microsoft's Office 365 cloud-based system. Control of these accounts was seized by further infiltration on Monday, October 22, 2012. Since then I have been in constant communication with Microsoft, investigating who took control of the accounts, and working with Microsoft to prove that Denarii is the rightful owner of those accounts.

24. Denarii still lacks access to their email accounts.

25. Microsoft has also confirmed that the Denarii email accounts assigned to Greynier Fuentes and Omar Arab were deleted from the system by the intruder.

26. I continue to work with Microsoft to restore the emails that were maintained in those accounts, and to ensure that Denarii has access to its own email system.

27. To date, Denarii still remains without the proper usernames and passwords to its network switches and routers, which are critical to the maintenance and security of the Denarii network.

28. Denarii is also missing its extensive documentation and manuals which explain the function and role of each server within the broader network. When dealing with such a sophisticated network, such information is foundational to any understanding of how the network is configured and how any problems can be fixed. This documentation serves no purpose outside the organization, but its absence is detrimental to anyone who now seeks to come in and understand the domain.

29. Denarii is also without the proper administrative password for its SQL server, responsible for running critical processes and operations within the Denarii network. This password was not disclosed by Grenier Fuentes upon his departure.

30. Without these pieces of information, it is extremely difficult to ensure the functionality and security of the Denarii network.

**FURTHER AFFIANT SAYETH NAUGHT.**


_____
Kesrick Grey

SWORN TO AND SUBSCRIBED before me this 26th day of October, 2012, by

_____ who is personally known to me or has produced

Fl. driver's license as identification and did take an oath.


_____
NOTARY PUBLIC, State of Florida
Print name:

My Commission Expires:

DAYAHA LOPEZ
MY COMMISSION #EE011765
EXPIRES: JUL 26, 2014
Bonded through 1st State Insurance

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Case No.:

DENARII SYSTEMS, LLC,
a Florida limited liability company

       Plaintiff,

vs.

OMAR ARAB and
GREYNIER FUENTES, individuals,

       Defendants.

_____/

## AFFIDAVIT OF MARCELA LAZARTE

**BEFORE ME,** this day personally appeared Marcela Lazarte, who first being duly sworn on oath, deposes and says:

1. I am over 18 years of age and make this affidavit based upon my personal knowledge.

2. Since April 2010, I have been an employee of Denarii Systems, LLC, where I am presently a business analyst.

3. Omar Arab served as my boss during the time he worked for Denarii.

4. At the beginning of 2012, I noticed that there was a new individual who would come to the Denarii office for 3-5 days at a time, despite the fact that he never seemed to be working. His name was Alberto Padin. The reason Mr. Padin caught my attention is because no one I had spoken with knew what his role was at the company. Instead, he went to and from the office and regularly returned with large numbers of shopping



{10302/00285427.1}          1

bags from different stores on Collins Avenue in Miami Beach.  At that point, our office was very close to the Collins Avenue shopping district.

5. Mr. Padin would typically be at the office for several days at a time, and then no one would see him at Denarii for several weeks.

6. In or around May 2012, I asked my boss, Mr. Arab, who Mr. Padin was and what Mr. Padin's role at Denarii was.  Mr. Arab then told me that Mr. Padin was not working for Denarii, but that he was a friend of Mr. Arab's from Argentina, who sometimes came to Miami for personal reasons.  Mr. Arab then explained that he had asked permission for Mr. Padin to use an office for personal business while Mr. Padin was in town, and that Denarii had agreed to this.

7. Mr. Padin was never working for Denarii, even though he was given an office to use for personal reasons on approximately 5-6 different occasions.

8. In or around July 2012, Mr. Arab came to me after being reprimanded by Denarii executives for failing to produce a certain assignment on time.  Mr. Arab was angry that the Denarii management team was being critical of his work.  During our conversation, Mr. Arab told me that the executives had "better stop messing" with him because he had the entire Denarii platform on a CD and was prepared to take it with him to Argentina if he decided to leave Denarii.

9. From his comments, it was clear that Mr. Arab intended to leave Denarii without a working platform so that Denarii could no longer perform its work and process any transactions.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Marcela Lazarte

SWORN TO AND SUBSCRIBED before me this 29ᵗʰ day of October, 2012, by

_____ who is personally known to me or has produced

FL DL# L263·540·75-702 as identification and did take an oath.


ADAM S. HALL
Notary Public - State of Florida
My Comm. Expires Aug 10, 2014
Commission # EE 16195

_____
NOTARY PUBLIC, State of Florida
Print name:

My Commission Expires: 8/10/14

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Case No.:

DENARII SYSTEMS, LLC,
a Florida limited liability company

      Plaintiff,

vs.

OMAR ARAB and
GREYNIER FUENTES, individuals,

      Defendants.

_____/

## AFFIDAVIT OF MARITZA LYNGVED

**BEFORE ME,** this day personally appeared Maritza Lyngved, who first being duly sworn on oath, deposes and says:

1. I am over 18 years of age and make this affidavit based upon my personal knowledge.

2. I am an employee of Denarii Systems, LLC, where I serve as Director of Compliance.

3. Denarii Systems is in the business of distributing and processing prepaid cards, which function much like debit cards or electronic gift cards.

4. These prepaid cards, issued through various banks in several countries, bear either a Visa or MasterCard logo, and can be used by purchasers at any vendor who accepts Visa- or MasterCard-endorsed cards.

5. Denarii oversees the real-time electronic processing of these cards, which requires a secure platform to protect both customers' and vendors' financial data.



6. The platform utilized by Denarii to process these Visa and MasterCard transactions was funded and developed by the company at a cost of several million dollars, and was completed through the work of software engineers hired either as employees of Denarii, or as independent contractors of Denarii.  These engineers wrote and developed a source code that enables the card-processing platform to run, and meets the stringent security requirements demanded by Visa and MasterCard to process instantaneous transactions on their networks.

7. The source code utilized in running and maintaining Denarii's card-processing platform is regularly updated to ensure optimum functionality and security, which requires the ongoing attention and work of software engineers working for Denarii.

8. On August 15, 2011, Omar Arab began working for Denarii as an at-will employee in the role of Chief Technology Officer.  In this role, Arab was responsible for overseeing both the production side of Denarii's operations, which included the development of source code and software for use by Denarii, as well as the services side of operations, which included the running of the card-processing platform.

9. Given his position within Denarii, Arab was one of the few authorized individuals with access to various passwords and documentation relating to Denarii's transaction-processing systems and platform.

10. Arab was terminated on October 22, 2012.

11. Greynier Fuentes began working for Denarii on June 28, 2010 as an at-will employee, and was employed as Director of Software Development.  Fuentes' job also gave him access to the highest levels of administrative control over Denarii's internal computer

network, as well as those servers containing Denarii's data, source code, and platform.

12. Fuentes resigned from his position effective immediately on October 19, 2012.

13. On October 18, 2012, both Arab and Fuentes asked to meet with senior executives at Denarii. During the meeting, Arab threatened Denarii's president, warning that, "You don't mess with the backbone of the company." Fuentes stated, "You don't want to create any trouble with us," indicating that there would be negative repercussions directed toward Denarii if the company continued investigating their actions.

14. Upon resignation, Fuentes was asked to supply a list of every password in his possession, so that Denarii could take reasonable steps to change these passwords and protect Denarii's systems.

15. Fuentes did supply management with a list, and was required to demonstrate in front of management that these passwords were correct.

16. Denarii has since learned that the list supplied by Fuentes was both incomplete and inaccurate. Not only was the list missing several key passwords, but subsequent events and investigation have revealed that many of the passwords supplied were either invalid at the time the list was turned over, or were subsequently changed by Fuentes following his submission of the list.

17. Arab and Fuentes, who are believed to have acted in concert during the documented intrusion on the Denarii network on October 21st, have also interfered with the Denarii network and stored data by taking control of Denarii's company email accounts, which are provided through the cloud-based Microsoft Office 365 service.

18. Arab and Fuentes took over administrative control of Denarii's Microsoft account on October 22, 2012, effectively preventing Denarii's access to email altogether. As a result, all Denarii employees were without their email on October 22nd and 23rd. In addition, Arab and Fuentes used this unauthorized access to Microsoft to delete data from the company cell phones of multiple Denarii executives. Arab and Fuentes also erased entire accounts from the system, as well as all of the stored individual emails contained in their own accounts.

19. Arab's and Fuentes' accounts are believed by Denarii to contain evidence of misappropriation and misconduct that Denarii is currently investigating.

20. Upon information and belief, Arab and Fuentes also used their former high-level access to hack into the Denarii system and misconfigure Denarii's transaction-processing platform, thus shutting down the ability of Denarii to communicate electronically with MasterCard on Monday, October 23rd.

21. This action not only crippled Denarii's ability to do business with MasterCard, but also created problems in terms of Denarii's relationship with MasterCard.

22. This misconfiguration has cost Denarii tens of thousands of dollars associated with lost business, as well as the necessity of paying employees and outside consultants significant fees to work through the night and troubleshoot the problem created by Arab and Fuentes.

23. Arab and Fuentes have misconfigured other portions of the Denarii network as well, including the account names and passwords associated with the network switches utilized in running Denarii's systems.

24. In addition, Arab and Fuentes have deleted key documentation from the Denarii system altogether, including a folder full of critical corporate documents relating to the configuration of every piece of hardware on the Denarii network. It is believed that Arab was keeping this documentation in a personal DropBox folder that was previously accessed through the Denarii network.

25. Denarii executives and employees continue to spend a great deal of time dealing with the issues created by Arab and Fuentes' unauthorized access to the Denarii network, as well as the threat of repeated intrusion. To aid in this effort, Denarii has hired Kesrick Grey, an independent network administration expert who has worked around the clock to ensure the functionality and security of Denarii's overall system.

26. Addressing the problems with the Denarii company email accounts (provided through Microsoft), the misconfiguration of the platform, the infiltration of the Denarii network, the ongoing security concerns relating to a potential intrusion by former insiders such as Arab and Fuentes, and the continued efforts to regain full working control of the Denarii network has cost Denarii significant sums of money—well into the tens of thousands of dollars. This sum is only made greater with the threat of potential misappropriation of Denarii's source code, which must also be addressed through costly protective measures.

**FURTHER AFFIANT SAYETH NAUGHT.**

Maritza Kyngved

SWORN TO AND SUBSCRIBED before me this 29th day of October, 2012, by

_Maritza Lyngved_ who is personally known to me or has produced

_____ as identification and did take an oath.

ADAM S. HALL
Notary Public - State of Florida
My Comm. Expires Aug 10, 2014
Commission # EE 16195

NOTARY PUBLIC, State of Florida
Print name:

My Commission Expires: 8/10/14

{10302/00285530.1}                    6