UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 12-24239-CIV-O'SULLIVAN

DENARII SYSTEMS, LLC,

    Plaintiff,

v.

OMAR ARAB,
GREYNIER FUENTES, and
FRANK ALVAREZ, individuals, and
BLIT TECHNOLOGIES CORP., a Florida corporation,

    Defendants.
_____/

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND SUPPORTING MEMORANDUM OF LAW**

    Plaintiff, Denarii Systems, LLC ("Denarii"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, respectfully moves for summary judgment on each of its claims, as asserted within Denarii's Second Amended Complaint [D.E. 70].

**INTRODUCTION**

    In October 2012, Denarii management was approached by Franco Ceruti, an independent contractor working for Denarii, who had a terrible tale to share. Ceruti told Denarii that one of its own trusted C-level officers, Omar Arab, was stealing hundreds of thousands of dollars from Denarii in the form of kickbacks, false invoices, and sham companies. Worst of all, Ceruti claimed, Arab and his right-hand man, Greynier Fuentes, were not content to simply steal money. The two had a larger plan to steal Denarii's source code and begin a competitor entity utilizing both Denarii's proprietary software and its clients. As Ceruti explained, Arab and Fuentes had convinced at least one employee, Frank Alvarez, to join them.

    Sensing that his story was not believed, Ceruti began covertly recording a series of meetings where Arab, Fuentes, and Alvarez were present, and where their plans to leave Denarii

were discussed. The story to emerge from these meetings, as well as the record evidence that has since been collected, demonstrates that Franco Ceruti's story was not only credible, but represented a mere fragment of the illegal conduct the Defendants had engaged in during their employment with Denarii.

As Denarii's Second Amended Complaint sets forth, the Defendants' illegal conduct ranges from fraud, to misappropriation of trade secrets, to civil conspiracy, to computer hacking and deletion of critical electronic data. Each of these claims has been proven through detailed forensic analysis of computer data and banking records. Accordingly, and as established below, Denarii is entitled to summary judgment in its favor on each count of its Second Amended Complaint [D.E. 70].

## LEGAL STANDARD

Summary judgment in the movant's favor shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "*Some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original).

Materiality is determined by "substantive law," and a fact will only be deemed material if it "might affect the outcome of the suit under governing law." *Id*. at 248. Further, a material fact is only held in "genuine" dispute where there is "sufficient evidence supporting the claimed factual dispute … to require a jury or judge to resolve" the dispute at trial. *Id*. at 249. See also *Mindis Metals Inc. v. Trans. Ins. Co*., 209 F.3d 1296, 1298 (11th Cir. 2000) ("mere presence of an alleged factual dispute between the parties does not make summary judgment improper; a genuine issue of material fact must exist"); *Sanguinetti v. United Parcel Serv., Inc*., 114 F.Supp.2d 1313, 1316 (S.D. Fla. 2000) ("mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion").

Once the moving party identifies the absence of any genuine issue of material fact, the burden is shifted to the non-moving party, who may defeat a motion for summary judgment only by setting forth "specific facts showing that there is a genuine issue for trial." *Sanguinetti*, 114 F.Supp.2d at 1316.

As the Supreme Court expressed in *Celotex Corp. v. Catrett*, summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

### ARGUMENT

The crux of Denarii's Complaint stems from a series of illegal actions undertaken in concert by Defendants Arab, Fuentes, and Alvarez. Specifically, Denarii maintains within its Second Amended Complaint that the three former employees conspired to bring about the demise of Denarii by stealing the company's proprietary software, beginning a competitor entity, and going into business with Denarii's previous customers. In order to ensure that Denarii was not able to successfully process card transactions itself, the three co-conspirators planned to leave Denarii without access to its networks, servers, and critical system documentation that would assist Denarii in any troubleshooting after their departure. Each of these issues was discussed in meetings, held in both June 2012 and October 2012, with other Denarii employees who have testified to the contents of these discussions.

Not content with mere discussion, the Defendants' conspiracy became a reality when news of the Defendants' misconduct spread to Denarii management in early October 2012. It was at this time that Defendants took their first overt act in implementing their scheme: namely, the copying of Denarii's proprietary source code on October 15, 2012. After Defendant Fuentes' resignation on October 19, 2012, the stakes grew higher. On the date of Fuentes' resignation, he intentionally deleted data from his company-issued laptop, erasing critical documentation, emails, and other data belonging to Denarii. Days later, the Defendants hacked into Denarii's computer systems, crippling the company's ability to process card transactions, as the group had planned. When Defendant Arab was terminated on October 22, 2012 as a result of his misconduct, the Defendants once more wiped the Denarii-issued laptop and iPhone assigned to Arab. In a final attack on the company's ability to operate, Defendant Fuentes, the sole individual with administrative access to Denarii's Microsoft Office 365 account, caused the company's email system to cease functioning altogether.

We will first address these acts in the context of the conspiracy existing among Arab, Fuentes, and Alvarez, and thereafter will turn to the underlying claims within the Second Amended Complaint.

I. **Denarii Is Entitled To Summary Judgment On Count V Of Its Complaint, For Civil Conspiracy**

"A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to plaintiff as a result of the acts done under the conspiracy." *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159-60 (Fla. 3d DCA 2008). "Conspiracy is not a separate or independent tort but is a vehicle for imputing the tortuous [sic] actions of one co-conspirator to another to establish joint and several liability." *Hoch v. Rissman, Weisberg, Barrett*, 742 So. 2d 451, 460 (Fla. 5th DCA 1999).

"To be held liable for the acts of all co-conspirators, each co-conspirator 'need only know of the scheme and assist in it in some way.' " *Principal Life Ins. Co. v. Mosberg,* No. 09–22341–CIV, 2010 WL 473042, at *6 (S.D.Fla. Feb. 5, *2010*) (quoting *Donofrio v. Matassini,* 503 So.2d 1278, 1281 (Fla. 2d DCA 1987)). Furthermore, as addressed in *Burger v. Hartley*, 896 F. Supp. 2d 1157, 1169 (S.D. Fla. 2012), summary judgment is an appropriate vehicle to determine whether a plaintiff has established a conspiracy sufficient to warrant joint and several liability. *See Time Warner Entm't/Advance–Newhouse P'ship v. Worldwide Elecs., L.C.,* 50 F.Supp.2d 1288, 1301 n. 13 (S.D.Fla.1999) (finding that on plaintiff's motion for summary judgment where plaintiff pleaded, and the court found, that the defendants engaged in a conspiracy to manufacture, modify, and sell pirate decoders, joint and several liability could be imposed). "Thus, this Court may properly determine whether Plaintiffs have demonstrated that joint and several liability applies based upon their conspiracy claim." *Burger v. Hartley*, 896 F. Supp. 2d at 1169.

Here, there is no dispute as to the fact that Arab and Fuentes hosted a breakfast meeting at the South Beach Marriott Hotel in or around June, 2012. Statement of Material Facts ("SMF" at ¶ 15. As both Carlos Alonso and Franco Ceruti have testified, the purpose of this meeting was to discuss Arab and Fuentes' plan to steal Denarii's proprietary source code, begin a competitor card processing company with Denarii's clients, and "end" Denarii. SMF at ¶¶ 15-16. One means of crippling Denarii, as discussed by Arab at the meeting, consisted of leaving the company, en masse, without any of the documentation, expertise, or administrative access necessary to run the platform and successfully process prepaid card transactions. SMF at ¶ 17.

At this meeting, Arab and Fuentes sought help from other Denarii employees in carrying out this scheme. SMF at ¶ 18.

At or near the beginning of October, Ceruti (without Denarii's knowledge or request) recorded a number of additional meetings wherein Defendants Arab, Fuentes, and Alvarez discussed both matters relating to general business, as well as their plan to leave Denarii and steal Denarii's proprietary source code. SMF at ¶¶ 21-25. These tapes include comments by Arab that he already had "a buyer for 2.0" – referring to the latest version of Denarii's proprietary software – and that he could readily obtain a different office for the group, once they were ready to leave. SMF at ¶ 24. In addition, the meetings contain comments made by Fuentes specifically regarding the turnover of passwords upon the group's departure from Denarii, as well as discussion as to how the co-conspirators could disrupt Denarii's operations by turning over only a portion of the required passwords. SMF at ¶ 25. As Fuentes states at one point (in its English translation): "I stand, I stand, I stand before the judge. … I will go to trial and go before the judge and say: 'I resigned from this company, what do you need to know about me? This was my function over there, I handed them the passwords in such and such server… Oh, it's not there? Oh, I don't know. They were deleted. I left it all there.'" SMF at ¶ 25. The group's laughter at this comment betrays that such an explanation to the Court would be fraudulent.

Still, the group's discussions of conspiracy remained inchoate until October 15, 2012, when Defendant Alvarez – in the days immediately prior to the Defendants' departure from the company – misappropriated 8,563 files containing Denarii's proprietary source code. SMF at ¶ 33. This overt act makes clear that the Defendants began to act out their scheme, as discussed within the meetings.

Furthermore, the loss of passwords, costs associated with addressing the Defendants' hacking, and misappropriation of Denarii's source code – developed at a cost of millions of dollars – demonstrates that Denarii suffered significant damages relating to the Defendants' conspiracy. SMF at ¶ 3, 44. Having demonstrated each of the elements necessary to establish civil conspiracy, Denarii is entitled to summary judgment on this claim against Arab, Fuentes, and Alvarez. We now turn to the underlying causes of action.

## II. Denarii Is Entitled To Summary Judgment On Count I Of Its Complaint, For Violation Of Florida's Uniform Trade Secrets Act

Florida's Uniform Trade Secrets Act ("FUTSA") requires the plaintiff to establish that:

> (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy, and
>
> (2) the secret it possessed was misappropriated, either by one who knew or had reason to know that the secret was improperly obtained or by one who used improper means to obtain it.

*Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F.Supp.2d 1271, 1291 (S.D. Fla. 2001) (citing Fla. Stat. § 688). To qualify as a trade secret under the statute, the "information that the plaintiff seeks to protect must derive economic value from not being readily ascertainable by others and must be the subject of reasonable efforts to protect its secrecy." *Id*. (citing *American Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (applying Florida law)). Relief under the statute includes provisions for both monetary damages and injunctive relief. Fla. Stat. §§ 688.003-688.004; *see Hatfield v. AutoNation, Inc.*, 939 So. 2d 155, 157 (Fla. 4th DCA 2006) ("The statute provides injunctive relief when trade secrets have actually been misappropriated, as here, or misappropriation has been threatened. An injunction with respect to stolen business secrets is authorized where it will eliminate commercial advantage derived from the misappropriation and affirmative acts to protect a trade secret can be compelled by court order.").

  Plaintiff's source code – which is utilized in running its card processing platform and which has cost millions of dollars to develop, maintain and upgrade (SMF at ¶ 3) – constitutes a trade secret under the FUTSA. *See, e.g., Pegasus Imaging Corp. v. Northrop Grumman Corp.*, 2010 WL 4627721, at *5 (M.D. Fla. Nov. 5, 2010) (source code qualifies as trade secret under the FUTSA). Denarii took reasonable steps to protect the secrecy of its source code – the company's lifeblood – by ensuring that a limited number of trusted individuals had access to this information, including the Defendants. SMF at ¶ 4. Such access was only available via password to authorized individuals. SMF at ¶ 5. This trade secret information was misappropriated by Defendants on the afternoon of October 15, 2012, when Defendant Frank Alvarez copied 8,563 Visual Studio files to a removable USB device, in furtherance of the Defendants' conspiracy to misappropriate Denarii source code and begin a competitor entity. SMF at ¶ 33. At the time, Alvarez was logged into his Denarii-issued Dell Latitude laptop under his own user profile, which allowed him access to these files. SMF at ¶ 34. Alvarez himself concedes that no one could have accessed his computer to steal the files without his knowledge. SMF at ¶ 35.

Having established each element of its FUTSA claim, Denarii is entitled to summary judgment in its favor.

### III. Denarii Is Entitled To Summary Judgment On Count II Of Its Complaint, For Violation Of The Computer Fraud And Abuse Act

The Computer Fraud and Abuse Act ("CFAA"), codified at 18 U.S.C. § 1030, is a federal criminal statute which prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] … information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). The CFAA also provides for a "civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). The relevant portion of the statute imposes liability on whoever:

> (5)(A) knowingly causes the transmission of a program, information, code or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; … [or]
>
> (B) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization to a protected computer.

18 U.S.C. § 1030(a)(5)(A).

In the instant case, Denarii's computers and servers qualify as "protected computers" under the statute due to their use in interstate commerce; namely, through the processing of prepaid card transactions on the MasterCard network. SMF at ¶ 1. In a number of instances described below, the Defendants caused damage to Denarii's computers both through the destruction of data, as well as the unauthorized entry to Denarii's networks and the accompanying misconfiguration of Denarii's network switches (an action aimed at making it impossible for Denarii's card processing platform to run). SMF at ¶¶ 33, 37-42, 46-57.

Specifically, on October 19, 2012, while Fuentes had possession of the Denarii Dell Latitude laptop assigned to him, he logged into Denarii's computer system utilizing his administrator credentials. SMF at ¶ 37. After logging in, he deleted the "gfuentes" user profile from the system and overwrote the user's Windows Registry, in turn erasing activity and documents on the computer. SMF at ¶ 38.

Similarly, on October 22, 2012, immediately after being terminated by Denarii and while Arab had possession of the Denarii Mac laptop assigned to him, Arab logged in and deleted the "oarab" user profile, along with the documents contained therein, from the Denarii computer

assigned to Arab. SMF at ¶ 46. One minute after deleting the "oarab" account on the Mac computer, Arab created a new user by the name of "omar," containing no user documents or Internet history. SMF at ¶ 47. On that same date, and while Arab had possession of the Denarii-owned iPhone 4S assigned to Arab, Arab selectively deleted content dated prior to October 22, 2012. SMF at ¶ 48. Given the similarities in deletions undertaken by Arab and Fuentes, it is believed that Fuentes – who possessed the expertise and knowledge to take such actions – assisted in Arab's efforts to delete this data.

In addition to this activity undertaken in violation of the CFAA, Fuentes, using an IP address owned by Greytex Incorporated (a Fuentes controlled entity), created a backdoor user account in Denarii's Windows Active Directory under the name "ecadena." SMF at ¶ 39. This user account was created on October 17, 2012 at 7:28 pm through the administrator account linked to Greynier Fuentes, less than two days before Fuentes' resignation from Denarii. SMF at ¶ 39. Fuentes then used this backdoor user account to gain unauthorized access to Denarii's computer system after Fuentes' resignation on October 19, 2012—including access to Denarii's computers on October 20, 2012 and October 21, 2012. SMF at ¶ 40. During such access, Fuentes misconfigured several of Denarii's network switches, in turn causing Denarii's platform to cease communication with MasterCard and fail to process any card transactions. SMF at ¶ 41. After hacking into Denarii's network on October 21, 2012, Fuentes, again using his Greytex IP address, attempted to erase his tracks by deleting Windows events from the relevant logs. SMF at ¶ 42.

These activities not only caused Denarii to lose the functionality of its platform, but also forced Denarii to address the intrusion through additional safety precautions and forensic evaluations. SMF at ¶ 43. As documented by the fees paid to Kesrick Grey and Andrews International, Denarii meets the $5,000.00 statutory threshold required to succeed on its CFAA claim. SMF at ¶ 44. Having met each requirement of the statute, Denarii is entitled to summary judgment on Count II.

### IV.     Denarii Is Entitled To Summary Judgment On Count III Of Its Complaint, For Violation Of The Stored Communications Act

The Stored Communications Act ("SCA") is a federal criminal statute codified in relevant part at 18 U.S.C. § 2701, with a civil cause of action being provided under the Act in § 2707. The relevant portion of the SCA imposes criminal and/or civil liability on whoever:

> (1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or
>
> (2) intentionally exceeds an authorization to that facility;
>
> and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage …

18 U.S.C. § 2701(a).  Under the statute, "electronic communication service" is defined as "any service which provides users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). "Thus, the SCA clearly applies, for example, to information stored with a phone company, Internet Service Provider (ISP), or electronic bulletin board system (BBS)." *United States v. Steiger*, 318 F.3d 1039, 1049 (11th Cir. 2003).

Greynier Fuentes was granted administrative access to Denarii's Microsoft Office 365 in his role as Denarii's Director of Software Development.  SMF at ¶ 49.  Denarii utilized Microsoft Office 365 to host its company email systems.  SMF at ¶ 50.  As documentation from third-party Microsoft establishes, Fuentes was the sole administrator on the account.  SMF at ¶ 51.  On October 19, 2012, Fuentes resigned from his position as an employee of Denarii.  SMF at ¶ 36.  As such, Fuentes was no longer authorized to make changes to Denarii's Microsoft Office 365 account on Denarii's behalf on or after October 19, 2012.

On October 22, 2012, following this resignation, Denarii lost all access to its company-wide email system due to administrative changes that had been made to the account.  SMF at ¶ 52.  Denarii promptly began contacting Microsoft seeking to regain control of its email account and establish a new administrator for the account.  SMF at ¶ 53.  However, Microsoft refused to acknowledge ownership of the domain by Denarii, and continued to contact Fuentes in managing the account, as Fuentes remained the only individual authorized to make any administrative changes to the account.  SMF at ¶ 54.  The Microsoft documentation establishes that Fuentes was uncooperative in this regard.  SMF at ¶ 55.  After numerous attempts to establish account ownership and take control of its own Microsoft Office 365 account, Denarii was forced to discontinue use of its "denariisystems.com" domain and create a new domain, "denariiglobal.com."  SMF at ¶ 56.  Accordingly, Denarii lost access to at least 23 email accounts associated with the "denariisystems.com" domain, due to administrative changes made to Denarii's Microsoft Office 365 account after Fuentes' departure.  SMF at ¶ 57.  Such information qualifies as statutorily protected information under the provisions of the SCA. *See*

18 U.S.C. § 2510(15) (defining "electronic communication service" as "any service which provides users thereof the ability to send or receive wire or electronic communications.").

Furthermore, this activity is in keeping with Arab and Fuentes' deliberate withholding of accurate passwords and administrative login information, as discussed in Section I., *supra*. See SMF at ¶ 25.

Based on these facts, Denarii is entitled to summary judgment on its claim brought pursuant to the Stored Communications Act.

V. **Denarii Is Entitled To Summary Judgment On Count IV Of Its Complaint, For Injunctive Relief**

Prior to removal of the instant action, a temporary injunction against Defendants Arab and Fuentes was entered by the State Court on October 31, 2012. [D.E. 1-2 at p. 15-19]. As part of the temporary injunction, the Court made detailed findings of fact stating that Denarii had established each of the elements necessary for entry of a temporary injunction, including the likelihood of success on Denarii's trade secrets, CFAA and SCA claims. [D.E. 1-2 at p. 17-18, ¶¶ 12-16]. The State Court based its findings on the affidavits of Carlos Alonso, Franco Ceruti, Kesrick Grey, Marcela Lazarte, and Maritza Lyngved, all of whom offered sworn testimony relating to the Defendants' hacking, the loss of Microsoft Office 365 service, the June 2012 Marriott breakfast meeting, Defendants' fraudulent invoicing scheme, and misappropriation of Denarii's proprietary source code. [D.E. 1-2].

After removal, Defendants Arab, Fuentes, and Alvarez moved to dismiss Denarii's injunction claim [D.E. 39 at p.7; D.E. 65], which is aimed at enjoining the Defendants from otherwise improper and unauthorized actions including:

a. accessing Denarii's internal systems network;

b. accessing Denarii's servers, responsible for running Denarii's processing platform;

c. obtaining, modifying, or deleting any portion of Denarii's proprietary source code;

d. obtaining, modifying, or deleting any stored electronic information and data housed within the Denarii system, including but not limited to, company email communications, documents, certifications for Denarii's products and services, documentation relating to the administrative functions of Denarii, and passwords;

e. obtaining, modifying, or deleting any of Denarii's stored documents kept in the DropBox folder removed by Arab and Funetes; and

  f. using, modifying, distributing, or selling any portion of Denarii's proprietary source code.

[D.E. 70 at ¶ 95].

  On May 31, 2013 [*see* D.E. 55, 67, 69], this Court conducted a hearing on the Defendants' motion to dismiss, and subsequently denied the Defendants' motion with regard to Count IV of Denarii's pleading, seeking injunctive relief. [D.E. 67]. As such, the preliminary injunction properly remains in place. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 435-36 (1974) ("Judicial economy is promoted by providing that proceedings had in state court shall have force and effect in federal court, so that pleadings filed in state court, for example, need not be duplicated in federal court.").

  Furthermore, based on the Defendants' violations (discussed *supra*) of the FUTSA, CFAA, and SCA – all of which provide for injunctive relief – Denarii is entitled to a permanent injunction against Defendants. *See, e.g.*, *TracFone Wireless, Inc. v. Cabrera*, 2012 WL 3264514, at *7 (S.D. Fla. July 11, 2012) (granting permanent injunction after finding defendant employee in violation of CFAA where employee exceeded authorized access to proprietary computer system in order to alter information in the system); *Hatfield v. AutoNation, Inc.*, 939 So. 2d 155, 157 (Fla. 4th DCA 2006) ("The statute provides injunctive relief when trade secrets have actually been misappropriated, as here, or misappropriation has been threatened. An injunction with respect to stolen business secrets is authorized where it will eliminate commercial advantage derived from the misappropriation and affirmative acts to protect a trade secret can be compelled by court order."). The entry of such an injunction remains proper based on the affidavits provided in October 2012 to the State Court, as well as the additional record evidence cited by Plaintiff herein.

### VI. Denarii Is Entitled To Summary Judgment On Count VII, For Fraud

  Under Florida law, the elements of fraud are: "(a) a false representation of fact, known by the party making it to be false at the time it was made; (b) that the representation was made for the purpose of inducing another to act in reliance on it; (c) actual reliance on the representation; and (d) resulting damages." *Kent v. Sullivan*, 793 So.2d 1027 (Fla. 5th DCA 2001). While the defendant must be responsible for the false representation or omission, fraud is nevertheless

actionable where the defendant chooses an indirect means of making the representation. *See Philip Morris USA, Inc. v. Naugle*, 103 So.3d 944, 947 (Fla. 4th DCA 2012) ("It is not necessary that a direct statement be made to the representee in order to give rise to the right to rely upon the statement, for it is immaterial whether it passes through a direct or circuitous channel in reaching him, provided it be made with the intent that it shall reach him and be acted on by the injured party.") (internal citations omitted).

Accordingly, a plaintiff may state an actionable claim for fraud against individuals who perpetuate the submission of fraudulent invoices, even where the individual's name does not appear on the invoice itself. For example, in *Walgreen Co. v. Premier Products of America*, defendants Thomas Carlin and Scot Monette submitted an estimated 1,500 false invoices to Walgreens through the corporate entity Premier Products of America. 2012 WL 527169 (M.D. Fla. Feb. 17, 2012). Many of these invoices were paid by Walgreens despite the fact that the products contained on the invoices were never delivered to Walgreens. *Id*. at *1. Walgreens subsequently asserted a number of claims against both the corporate entity and the individuals, Carlin and Monette, based upon the individuals' role in submitting the false invoices for payment. *Id*. Reaching the issue on a motion to dismiss, the Court permitted the mail fraud, wire fraud, and fraudulent misrepresentation claims to proceed against the individual defendants, despite the fact that the invoices had been submitted through a corporate entity. Id. at *5.

Similarly, in *Simon* Property *Group v. Lauria*, the plaintiff asserted fraud against multiple defendants who participated in a fraudulent invoicing scheme led by defendant Lauria. 2012 WL 1934405 (M.D. Fla. May 29, 2012). Similar to the individual and corporate defendants named by Denarii, the *Simon* plaintiff pled allegations against Defendants who were divided into four categories:

> (1) Lauria, her husband (Robert James Lauria) and their two daughters (Rachael Lauria and Sarah Lagi); (2) companies formed for the purpose of defrauding Simon and controlled by Lauria's family (the "Lauria Companies"); (3) companies not controlled by Lauria or her family, but nonetheless paid Lauria kickbacks for the business she awarded (the "Image Companies" or "Image Defendants"); (4) the three individual Defendants that controlled the Image Companies, Ryan Deming Dale Takio, and Timothy Herman.

*Id*. at *1; *see also Simon Property Group v. Lauria*, 2012 WL 3128957 (M.D. Fla. Aug. 1, 2012) (denying dismissal of fraud claim where defendant participated in scheme to submit fraudulent third-party invoices to employer for payment).

The record evidence presented by Denarii demonstrates that Arab and Fuentes undertook a detailed scheme to defraud Denarii through the use of a false invoicing scheme utilizing invoices from both Blit Technologies Corp. and Optimus Consulting Services. With regard to Blit Technologies Corp. ("Blit"), there is no dispute that the company was incorporated in March 2013 by Manuel Munoz, the father of Fuentes' girlfriend, Claudia Munoz. SMF at ¶¶ 58-59. It is also undisputed that Manuel Munoz lives with Fuentes and Claudia Munoz, and that his professional background is that of an automobile mechanic. SMF at ¶¶ 59-61. As Mr. Munoz testified, he is not skilled at the use of computers, and did not personally carry out any activities on behalf of Blit despite officially serving as the company's president, vice president, secretary, treasurer and director. SMF at ¶ 62.

It is further undisputed that Denarii received invoices seeking payment of $93,963.00 from Blit, which were subsequently paid by Denarii. SMF at ¶ 63. While these invoices allegedly reflect that Denarii paid Blit for Microsoft licensing packages, servers, server installation, and software development services, Denarii's own investigation has revealed that the Microsoft licensing packages, servers, and server installation were never provided to Denarii. SMF at ¶ 64. For example, Denarii paid Blit for licenses relating to Sharepoint, as well as a server and server configuration services allegedly provided to run Sharepoint. SMF at ¶ 65. However, Denarii never received licenses for Sharepoint. Nor did it receive a server to house Sharepoint or its data. SMF at ¶ 66. Accordingly, at a minimum, Denarii paid $78,573.00 for goods and services that were never rendered by Blit. SMF at ¶ 67. Despite this fact, Defendant Arab, acting as Chief Information Officer, approved the payment of these invoices, all the while knowing that such services were not being rendered and such goods were not being provided. SMF at ¶ 68.

Moreover, as the record evidence produced by Bank of America conclusively shows, the Blit account that received the funds from Denarii functioned largely as a personal piggy bank for Defendant Fuentes and Manuel Munoz. SMF at ¶ 70. As transactions associated with the account exhibit, the funds from Denarii constituted the vast majority of deposits into the account. SMF at ¶ 70. And unlike a typical business account, these funds were not used to support

payroll or even goods such as Microsoft licensing or servers. SMF at ¶ 71. Instead, 81 percent of the funds from the account were withdrawn as cash. SMF at ¶ 71. Of the funds that were not withdrawn as cash, Blit's bank statements show that the monies paid by Denarii were used for personal expenses such as paying an FP&L bill linked to Greynier Fuentes' utility account, paying student loans owed by Greynier Fuentes, paying for a Comcast account associated with Greynier Fuentes' company Greytex, paying for gasoline, groceries, clothing at Armani Exchange, furniture, and even a trip to DisneyWorld. SMF at ¶ 72. These unassailable links to Defendant Fuentes demonstrate that Blit Technologies was nothing more than an alter ego sham entity, created for the sole purpose of defrauding Denarii.

Based on these false invoices, documented links to Defendant Fuentes, and Defendant Arab's complicity in approving the fraudulent invoices, Denarii is entitled to summary judgment on Count VII.

### VII.   Denarii Is Entitled To Summary Judgment On Count VIII, For Fraud

As addressed above, the fraud was not limited to Greynier Fuentes and Blit Technologies. Rather, the record evidence shows that Omar Arab was abusing his power as Chief Information Officer to approve additional invoices from his personal friend and former business partner, Alberto Padin.

As acknowledged by Arab within his deposition testimony, Alberto Padin and Arab worked together while Arab lived in Argentina. SMF at ¶ 73. As is also undisputed, Padin was formally trained as an accountant, and served in this capacity when Arab and Padin became business partners in Argentina, several years prior to Arab's employment with Denarii. SMF at ¶ 74. It is further undisputed that Padin did not have the skills or expertise to serve as a database administrator to Denarii. SMF at ¶ 75. In reality, the record evidence illustrates, Padin had trouble with everyday computer tasks, such as setting up an Excel spreadsheet. SMF at ¶ 76.

However, the invoices submitted by Alberto Padin's company, Optimus Consulting Services, to Denarii tell a different story. According to the $94,500 worth of invoices paid to Optimus Consulting Services by Denarii, Padin worked as a database administrator and project manager for Denarii for approximately nine months. SMF at ¶ 77. Arab, as Chief Information Officer, approved these invoices for payment, with the exception of Optimus' final October 2012 invoice in the amount of $10,500. SMF at ¶ 78. Arab's approvals took place despite the fact that there is no evidence to establish that Padin worked on a single Denarii project or ever once

interacted with Denarii software developers or Denarii's software architect. SMF at ¶ 79. As Denarii's employees and independent contractors have testified, Padin was not present at Denarii, did not provide database administrator services, and was predominantly unheard of within the relatively small company. SMF at ¶ 80. Even Defendant Alvarez acknowledged within his deposition testimony that Denarii did not have a database administrator, and that he would have known if Denarii were employing such an individual. SMF at ¶ 81.

Padin's bank statements, however, explain much of this mystery. Within the statements of the account utilized to accept payment from Denarii, the activity shows that the majority of the funds received by Padin were transferred or paid directly back to Omar Arab—the very individual responsible for hiring and approving payment to Alberto Padin through the Optimus Consulting Services entity. SMF at ¶ 82. Given this information, it is clear that accountant Alberto Padin served not as a database administrator for Denarii, but simply as a cover for Arab's substantial fraud perpetuated on Denarii.

Having demonstrated evidence of this fraud through undisputed record testimony, Denarii is entitled to summary judgment on Count VIII of its Second Amended Complaint.

## DAMAGES

Based on Defendants' willful violations of the law, Denarii seeks $44,799.80 in damages based on professional fees associated with responding to the Defendants' hacking and data destruction; $30,000 in damages based on professional fees associated with forensic analysis of hardware and software following Defendants' hacking and data destruction; $7,437.50 in damages based on costs associated with securing premises and data centers following Defendants' misconduct; $25,000 in statutory damages based on violation of the SCA; $78,573 in damages based on fraudulent Blit Technologies invoices; and $84,000 in damages based on fraudulent Optimus invoices, exclusive of attorney's fees, costs, and punitive damages. SMF at ¶ 85.

## CONCLUSION

For all of the foregoing reasons, Plaintiff/Counterdefendant Denarii Systems, LLC respectfully requests that this Court enter an order granting summary judgment in Denarii's favor on all of the claims asserted in Defendants/Counterplaintiffs' Second Amended Counterclaims,

dismissing the counterclaim in its entirety with prejudice, and granting such other and further relief as the Court may deem just and proper.

        Respectfully submitted,

        HALL, LAMB AND HALL, P.A.
*Attorneys for Denarii Systems, LLC*
2665 South Bayshore Drive, PH1
Miami, Florida 33133
TEL. 305-374-5030
FAX. 305-374-5033

By: /s/ Adam S. Hall
    ADAM S. HALL
    FBN 109983
    COLLEEN L. SMERYAGE
    FBN 100023

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 10, 2014, I caused the foregoing document to be electronically filed with the Clerk of Court via CM/ECF. I also certify that the foregoing document is being served this day via the Court's CM/ECF system on:

Gomm & Smith, P.A.
*Attorneys for Defendants/Counterplaintiffs*
*Omar Arab and Greynier Fuentes*
175 SW 7th Street, Suite 2110
Miami, Florida 33130
TEL. 305-856-7723
FAX. 786-220-8265
Kristin.drecktrah@gommsmith.com
Quinn.smith@gommsmith.com

Law Office of Rick Yabor, P.A.
*Attorneys for Defendant*
*Frank Alvarez*
2200 South Dixie Highway
Suite 704
Coconut Grove, Florida 33133
TEL. 305-322-5617
FAX. 305-779-5902
Rick.yabor@yaborlaw.com

                                                By: /s/ Colleen L. Smeryage
                                                   COLLEEN L. SMERYAGE