UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 12-24239-CIV-O'SULLIVAN

DENARII SYSTEMS, LLC,
a Florida Limited Liability Company,

       Plaintiff,

v.

OMAR ARAB,
GREYNIER FUENTES, and
FRANK ALVAREZ, individuals, and
BLIT TECHNOLOGIES CORP., a Florida corporation.

       Defendants.
_____/

**STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT RELATING TO DENARII'S SECOND AMENDED COMPLAINT *AND* DEFENDANTS/COUNTERPLAINTIFFS' SECOND AMENDED COUNTERCLAIM**

1. Denarii is a processor of prepaid financial products and services. Denarii's business is primarily focused on the processing of transactions associated with prepaid cards, which are accepted by vendors on the MasterCard network. [M. Lyngved Affidavit at ¶ 3].

2. In order to develop and maintain its card-processing platform, Denarii employs a team of software engineers and developers responsible for writing Denarii's proprietary source code and ensuring that Denarii's platform is both functional and secure. [M. Lyngved Affidavit at ¶ 4].

3. Denarii has invested several million dollars to develop, maintain, and upgrade its card processing platform through the development of proprietary source code. [M. Lyngved Affidavit at ¶ 5].

4. Denarii has taken reasonable steps to protect the secrecy of its source code by ensuring that a limited number of trusted individuals had access to this information, including Defendants Omar Arab, Greynier Fuentes, and Frank Alvarez. [M. Lyngved Affidavit at ¶ 6].

5. Access to Denarii's proprietary source code is only available via password to authorized individuals associated with Denarii. [M. Lyngved Affidavit at ¶ 7].

6. Denarii's team of software specialists previously included Defendant Omar Arab, who was hired as an employee of Denarii on August 15, 2011, and served as Denarii's Chief Information Officer. [O. Arab Depo. Exhibit 2].

7. Upon acceptance of employment, Arab was promised in writing an annual salary of $180,000 in exchange for his services as Chief Information Officer. [O. Arab Depo. Exhibit 2].

8. With regard to the $10,000 monthly payments Arab allegedly received, Arab testified that "[t]he additional money was for work at Denarii," failing to specify any additional work undertaken in consideration for the additional payments. [O. Arab Depo. at 66:22 – 67:8].

9. Arab's 2012 federal income tax return demonstrates that Arab did not report or pay taxes on the $10,000 monthly payments he now claims were part of his promised wages. [O. Arab Depo. Exhibit 5; O. Arab Depo. at 87:15 – 91:14].

10. Arab's tax return shows that Arab claimed the exact amount listed on his Denarii W-2 as wages on the return. This amount does not include the cash payments Arab claims to have received. [O. Arab Depo. Exhibit 3, 4, 5; O. Arab Depo. at 88:9 – 89:10].

11. Schedule C of Arab's tax return reports $90,000 in income Arab attributes to "system engineering" he performed for an unknown entity listed at his home address. [O. Arab Depo. Exhibit 5].

12. To offset this income, Arab claimed $92,253 in expenses associated with the "system engineering" work included on Arab's 2012 federal income tax return. [O.Arab Depo. Exhibit 5].

13. Denarii's team also included Defendant Greynier Fuentes, who was hired as an employee of Denarii on June 28, 2010, and who served as Denarii's Director of Software Development. ["New Hire Checklist;" G. Fuentes Depo. at 41:1-2].

14. Defendant Frank Alvarez was also an employee of Denarii throughout the relevant time period, and served as a programmer during his time with the company. [F. Alvarez Depo. at 17:20-22].

15. In June 2012 at the Hotel in South Beach, Defendants Arab and Fuentes told at least six other Denarii employees (including Defendant Alvarez) of their plan to misappropriate

Denarii's proprietary source code, begin their own competitor card processing company, and "end" Denarii. [C. Alonso Affidavit, D.E. 1-2 at ¶ 5; F. Ceruti Affidavit, D.E. 1-2 at ¶¶ 18-19; F. Ceruti Depo. at 126:20 – 137:3].

16. Defendants Arab and Fuentes also stated their interest in taking whatever clients Denarii had. [F. Ceruti Depo. at 134:22 – 137:1].

17. One means of crippling Denarii, as discussed by Arab at the meeting and subsequent meetings, consisted of leaving the company, en masse, without any of the documentation, expertise, or administrative access necessary to run the platform and successfully process prepaid card transactions. [F. Ceruti Depo. at 86:11-18; 128:2-19].

18. At this meeting, Arab and Fuentes sought help from other Denarii employees, including Frank Alvarez, in carrying out this scheme. [F. Ceruti Depo at 125:9-13; F. Ceruti Affidavit, D.E. 1-2 at ¶¶ 18-19].

19. At the beginning of October 2012, independent contractor Franco Ceruti approached Linna Rivera, Denarii's Human Resources Director, to expose fraudulent activity Ceruti believed Defendants Arab and Fuentes were committing, as well as the scheme Arab and Fuentes had discussed at the June 2012 breakfast meeting. [F. Ceruti Depo. at 73:22 – 76:6; 95:15 – 97:5; 170: 20 – 171:11; 213: 9-10].

20. As Mr. Ceruti testified, he approached Linna Rivera with information that Arab was defrauding Denarii through the receipt of kickbacks from various third-party contractors, was approving fraudulent invoices from a company called Optimus Consulting Services, and had participated in the creation of a fraudulent company called Blit Technologies Corp. through which Arab and Greynier Fuentes were carrying out an additional fraudulent invoicing scheme to con Denarii out of roughly $100,000. [F. Ceruti Depo. at 73:22 – 76:6; 95:15 – 97:5; 170: 20 – 171:11; 213: 9-10; M. Lyngved Affidavit at ¶ 8].

21. Concluding that Linna Rivera did not believe Ceruti's account of the Defendants' wrongdoing, Ceruti began recording a number of additional meetings wherein Defendants Arab, Fuentes, and Alvarez discussed both matters relating to general business, as well as their plan to leave Denarii with Denarii's proprietary source code. [F. Ceruti Depo. at 84: 17 – 95:14; 97:17 – 98:3].

22. Ceruti was not asked by Linna Rivera or any other member of Denarii's management team to make the recordings. Nor did Ceruti alert Denarii management to the fact

that he was recording the conversations prior to commission of the act. [F. Ceruti Depo at 97:17 – 98:3].

23.     The meetings recorded by Ceruti took place at Denarii's offices during work hours. [F. Ceruti Depo. 117: 19 – 25].

24.     These tapes include comments by Arab that he already had "a buyer for 2.0" – referring to the latest version of Denarii's proprietary software – and that he could readily obtain a different office for the group, once they were ready to leave.  [Recording Transcript 4 at p. 8].

25.     In addition, the meetings contain comments made by Fuentes specifically regarding the turnover of passwords upon the group's departure from Denarii, as well as discussion as to how the co-conspirators could disrupt Denarii's operations by turning over only a portion of the required passwords.  As Fuentes states at one point during a meeting (in its English translation): "I stand, I stand, I stand before the judge. … I will go to trial and go before the judge and say: 'I resigned from this company, what do you need to know about me? This was my function over there, I handed them the passwords in such and such server… Oh, it's not there? Oh, I don't know. They were deleted. I left it all there.'" [Recording Transcript 3 at pp. 96-97].

26.     Ceruti was not an employee of Denarii, but an independent contractor. [F. Ceruti Depo. at 163:18-20].

27.     Arab testified that he was unaware whether any of the recordings made by Ceruti were ever played by Denarii president Jonathan Mytnik, and that he was unaware whether Mytnik ever possessed a copy of the recordings.  [O. Arab Depo. at 194:7 – 198:8].

28.     Arab could not identify a single potential employer that heard the recordings made by Ceruti.  [O. Arab Depo. at 197:4 – 198:2].

29.     As a result of the information provided by Franco Ceruti, Denarii management immediately began investigating the accusations lodged by Ceruti, only to discovery that Ceruti's account was accurate. [M. Lyngved Affidavit at ¶ 9].

30.     Through its investigation, Denarii learned that Alberto Padin (the principal of Optimus Consulting Services, and the individual who was supposedly rendering database administrator services to Denarii) had invoiced the company for $94,500 in services that were never rendered, despite Arab's approval of the invoices. [M. Lyngved Affidavit at ¶ 10].

31. Similarly, Denarii discovered that Blit Technologies had been incorporated by the father of Greynier Fuentes' girlfriend, and had invoiced Denarii for over $60,000 in Microsoft licensing that Denarii had never received—in addition to $16,000 worth of server hardware and server configuration services that also never existed. [M. Lyngved Affidavit at ¶ 11].

32. Furthermore, through Mr. Ceruti's presentation of checks and wire transfer documentation corroborating Mr. Ceruti's account of providing kickbacks to Arab in exchange for Denarii contracts, Denarii confirmed that Arab had been receiving significant funds from Denarii's third-party providers and independent contractors. [M. Lyngved Affidavit at ¶ 12].

33. On October 15, 2012, Defendant Frank Alvarez copied 8,563 Visual Studio files containing Denarii source code to a removable USB device. [J.Pena Expert Report at pp. 18-19].

34. At the time the Visual Studio files were copied, Alvarez was logged into his Denarii-issued Dell Latitude laptop under his own user profile, which allowed him access to these files. [J. Pena Expert Report at pp. 18-19].

35. Alvarez concedes that no one could have accessed his computer to steal the files on the date in question without his knowledge. [F.Alvarez Depo. at 55:1-15].

36. On October 19, 2012, Defendant Fuentes resigned from Denarii. [G. Fuentes Depo at 121:9-25; 131:1-2].

37. On October 19, 2012, while Fuentes still had possession of the Denarii Dell Latitude laptop assigned to him, he logged into Denarii's computer system utilizing his administrator credentials. [J. Pena Expert Report at p. 8].

38. After logging in, Greynier Fuentes deleted the "gfuentes" user profile from the system and overwrote the user's Windows Registry, in turn erasing activity and documents on the computer. [J. Pena Expert Report at p. 8].

39. Prior to Fuentes' resignation, on October 17, 2012, Fuentes created a backdoor user account in Denarii's Windows Active Directory under the name "ecadena." When undertaking this action, Fuentes used an IP address owned by Greytex Incorporated, a Fuentes controlled entity. [J. Pena Expert Report at pp. 9-17].

40. Fuentes used this backdoor user account to gain unauthorized access to Denarii's computer system after Fuentes' resignation on October 19, 2012—including access to Denarii's computers on October 20, 2012 and October 21, 2012. [J. Pena Expert Report at pp. 9-17].

41. During Fuentes' unauthorized post-resignation access, Fuentes misconfigured several of Denarii's network switches, in turn causing Denarii's platform to cease communication with MasterCard and fail to process any card transactions. [K. Grey Expert Report].

42. After hacking into Denarii's network on October 21, 2012, Fuentes, using his Greytex IP address, then attempted to erase his tracks by deleting Windows events from the relevant logs. [J. Pena Expert Report at pp. 17-18].

43. Fuentes' activities not only caused Denarii to lose the functionality of its platform, but also forced Denarii to address the intrusion through additional safety precautions and forensic evaluations. [K. Grey Expert Report; J. Pena Expert Report].

44. Based on the fees paid to Kesrick Grey and Andrews International, the experts employed by Denarii to assist in the evaluation of Denarii's security breach, Denarii meets the $5,000.00 statutory threshold required to succeed on its CFAA claim. [K. Grey Invoices; J. Pena Expert Report].

45. On October 22, 2012, Omar Arab was terminated by Denarii for cause relating to his misconduct. [O. Arab Depo. Exhibit 6].

46. On October 22, 2012, shortly after being terminated by Denarii and while Arab still had possession of the Denarii laptop assigned to him, Arab logged into the computer system and deleted the "oarab" user profile, along with the documents contained therein, from the Denarii computer assigned to Arab. [J. Pena Expert Report at pp. 8-9].

47. One minute after deleting the "oarab" account on the Mac laptop, Arab created a new user by the name of "omar," containing no user documents or Internet history. [J. Pena Expert Report at pp. 8-9].

48. On that same date, October 22, 2012, and while Arab had possession of the Denarii-owned iPhone 4S assigned to Arab, Arab selectively deleted content dated prior to October 22, 2012. [J. Pena Expert Report at p. 9].

49. Greynier Fuentes was granted administrative access to Denarii's Microsoft Office 365 in his role as Denarii's Director of Software Development. [G. Fuentes Depo. at 128:11-15].

50. Denarii utilized Microsoft Office 365 to host its company email systems. [G. Fuentes Depo. at 127:22 – 128:4].

51. Fuentes was the sole administrator on the Microsoft Office 365 account associated with Denarii's domain, "denariisystems.com." [Microsoft Production "Item Detail"].

52. On October 22, 2012, following Fuentes' resignation, Denarii lost all access to its company-wide email system due to administrative changes that had been made to the account. [M. Lyngved Affidavit at ¶ 14; K. Grey Expert Report].

53. Denarii promptly began contacting Microsoft seeking to regain control of its email account and establish a new administrator for the account. [M. Lyngved Affidavit at ¶ 16; K. Grey Expert Report].

54. Microsoft refused to acknowledge ownership of the domain by Denarii, and continued to contact Fuentes in managing the account, as Fuentes remained the only individual authorized to make any administrative changes to the account. [M. Lyngved Affidavit at ¶ 17].

55. Fuentes was uncooperative in this regard, and did not respond to communications from Microsoft regarding Denarii's attempts to change the administrator associated with Denarii's account. [Microsoft Production "Item Detail"].

56. After numerous attempts to establish account ownership and take control of its own Microsoft Office 365 account, Denarii was forced to discontinue use of its "denariisystems.com" domain and create a new domain, "denariiglobal.com." [M. Lyngved Affidavit at ¶ 18; K. Grey Expert Report].

57. Denarii lost access to at least 23 email accounts associated with the "denariisystems.com" domain, due to administrative changes made to Denarii's Microsoft Office 365 account after Fuentes' departure. [M. Lyngved Affidavit at ¶ 19].

58. Blit Technologies was incorporated in March 2013 by Manuel Munoz. [M. Munoz Depo. Exhibit 1].

59. Manuel Munoz is the father of Fuentes' girlfriend, Claudia Munoz. Fuentes currently resides with both Claudia Munoz and Manuel Munoz. [M. Munoz at 6:16-25].

60. In March 2013, Fuentes resided in the same home as Manuel Munoz and Claudia Munoz. [M. Munoz Depo. at 6:16-25].

61. Manuel Munoz's professional background is that of an automobile mechanic. [M. Munoz Depo. at 11:23 – 12:8].

62. As Manuel Munoz testified, he is not skilled at the use of computers, and did not personally carry out any activities on behalf of Blit despite officially serving as the company's

president, vice president, secretary, treasurer, and director. [M. Munoz Depo. at 8:8 – 11:22, 17:13 – 18:2; M. Munoz Depo. Exhibit 1].

63. Denarii received $93,963 in invoices from Blit, which were subsequently paid by Denarii. [D.E. 70-1; M. Elkin Expert Report Exhibit E.1].

64. While these invoices reflect that Denarii paid Blit for Microsoft licensing packages, servers, server installation, and software development services, Denarii's own investigation has revealed that the Microsoft licensing packages, servers, and server installation were never provided to Denarii. [M. Lyngved Affidavit at ¶ 20].

65. Denarii paid Blit for licenses relating to Sharepoint, as well as a server and server configuration services allegedly provided to run Sharepoint. [M. Lyngved Affidavit at ¶ 21].

66. However, Denarii never received licenses for Sharepoint from Blit. Nor did it receive a server to house Sharepoint or its data. [M. Lyngved Affidavit at ¶ 21].

67. At a minimum, separating out any disputed fees Denarii owed to Humberto Moreno, Denarii paid $78,573 for goods and services that were never rendered by Blit. [M. Elkin Expert Report Exhibit E.1].

68. Defendant Arab approved the payment of Blit invoices, despite knowing that such services were not being rendered and such goods were not being provided. [M. Lyngved Affidavit at ¶ 22].

69. Blit's Bank of America account ending in 1915 functioned largely as a personal piggy bank for Defendants Fuentes and Manuel Munoz. [Blit Statements, BOA0000010 – BOA0000073; M. Elkin Expert Report].

70. Transactions associated with Blit's account exhibit that the funds from Denarii constituted the vast majority of deposits into the account. [Blit Statements, BOA0000010 – BOA0000073; M. Elkin Expert Report].

71. Unlike a typical business account, these funds were not used to support payroll or pay for goods such as Microsoft licensing or servers. Instead, 81 percent of the funds from the account were withdrawn as cash. [M. Elkin Expert Report].

72. Of the funds that were not withdrawn as cash, Blit's bank statements show that the monies paid by Denarii were used for personal expenses such as paying an FP&L bill linked to Greynier Fuentes' utility account, paying student loans owed by Greynier Fuentes, paying for a Comcast account associated with Greynier Fuentes' company Greytex, paying for gasoline,

groceries, clothing at Armani Exchange, furniture, and even an excursion to DisneyWorld. [Blit Statements, BOA000010 – BOA0000073; M. Elkin Expert Report].

73. Alberto Padin and Omar Arab worked together while Arab lived in Argentina. [O. Arab Depo. at 163:10 – 164:10; F. Ceruti Depo. at 34:4-7].

74. Padin was formally trained as an accountant, and served in this capacity when Arab and Padin became business partners in Argentina, several years prior to Arab's employment with Denarii. [O. Arab Depo. at 95:11-17; F. Ceruti Depo. at 61:19 – 65:14].

75. As an accountant, Padin did not have the skills or expertise to serve as a database administrator to Denarii. [F. Ceruti Depo. at 61:19 – 65:14].

76. Padin had trouble with everyday computer tasks, such as setting up an Excel spreadsheet. [F. Ceruti Depo. at 61:19 – 65:14].

77. Padin, through an entity called Optimus Consulting Services, submitted $94,500 worth of invoices for payment by Denarii. These invoices indicated that Padin was providing project management and database administrator services over a period of approximately nine months. [Optimus Invoices, D.E. 70-2].

78. Arab approved these invoices for payment, with the exception of Optimus' final October 2012 invoice in the amount of $10,500. [M. Lyngved Affidavit at ¶ 23].

79. Arab approved these payments despite the fact that there is no evidence to establish that Padin worked on a single Denarii project or ever once interacted professionally with Denarii software developers or Denarii's software architect. [M. Lyngved Affidavit at ¶ 24].

80. Denarii's employees and independent contractors have testified that Padin was not present at Denarii, did not provide database administrator services to Denarii, and was predominantly unheard of by members of the company. [F. Ceruti Depo. at 61:19 – 65:14; M. Lazarte Affidavit, D.E. 1-2 at ¶¶ 4-7].

81. Frank Alvarez testified that Denarii did not have a database administrator, according to his knowledge. [F. Alvarez Depo. at 88:23 – 89:2].

82. Bank statements associated with Alberto Padin's Optimus Consulting Services entity reveal that at least $45,000 of the funds received by Padin were transferred or paid directly back to Omar Arab—the very individual responsible for hiring and approving Denarii's payments to Padin. [M. Elkin Expert Report at Exhibit C1 ; M. Lyngved Affidavit at 23].

83. The Instituto Ecuatoriano De Seguridad Social ("IESS") terminated its contract with Denarii on the basis of mutual agreement.  [IESS Termination Agreement, DENARII00263901 – DENARII00263906].

84. The IESS termination agreement contains no assessment of wrongdoing, and no provision indicating that Denarii was expected or obligated to return any funds to the Ecuadorian government.  [IESS Termination Agreement, DENARII00263901 – DENARII00263906].

85. Based on Defendants' willful violations of the law, Denarii seeks $44,799.80 in damages based on professional fees associated with responding to the Defendants' hacking and data destruction; $30,000 in damages based on professional fees associated with forensic analysis of hardware and software following Defendants' hacking and data destruction; $7,437.50 in damages based on costs associated with securing premises and data centers following Defendants' misconduct; $25,000 in statutory damages based on violation of the SCA; $78,573 in damages based on fraudulent Blit Technologies invoices; and $84,000 in damages based on fraudulent Optimus invoices, exclusive of attorney's fees, costs, and punitive damages. [M. Lyngved Affidavit at ¶ 25; M. Elkin Expert Report].

        Respectfully submitted,

        HALL, LAMB AND HALL, P.A.
*Attorneys for Denarii Systems, LLC*
2665 South Bayshore Drive, PH1
Miami, Florida 33133
TEL. 305-374-5030
FAX. 305-374-5033

By: /s/ Adam S. Hall
    ADAM S. HALL
    FBN 109983
    COLLEEN L. SMERYAGE
    FBN 100023

## CERTIFICATE OF SERVICE

       I HEREBY CERTIFY that on February 10, 2014, I caused the foregoing document to be electronically filed with the Clerk of Court via CM/ECF. I also certify that the foregoing document is being served this day via the Court's CM/ECF system on:

Gomm & Smith, P.A.
*Attorneys for Defendants/Counterplaintiffs*
*Omar Arab and Greynier Fuentes*
175 SW 7th Street, Suite 2110
Miami, Florida 33130
TEL. 305-856-7723
FAX. 786-220-8265
Kristin.drecktrah@gommsmith.com
Quinn.smith@gommsmith.com

Law Office of Rick Yabor, P.A.
*Attorneys for Defendant*
*Frank Alvarez*
2200 South Dixie Highway
Suite 704
Coconut Grove, Florida 33133
TEL. 305-322-5617
FAX. 305-779-5902
Rick.yabor@yaborlaw.com

                                              By: /s/ Colleen L. Smeryage
                                                   COLLEEN L. SMERYAGE